**ORIGINAL**



U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

**FILED**

NOV I 0 2005

CLERK, U.S. DISTRICT COURT

By _____
                    Deputy

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS

| | |
|---|---|
| CONGREGATION EZRA SHOLOM, Individually and On Behalf Of All Others Similarly Situated, | Case No. |
| Plaintiff, | CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |
| vs. | **JURY TRIAL DEMANDED** |
| BLOCKBUSTER, INC.; NATIONAL AMUSEMENTS, INC.; VIACOM, INC.; JOHN F. ANTIOCO; RICHARD J. BRESSLER; JACKIE M. CLEGG; PHILIPPE P. DAUMAN; MICHAEL D. FRICKLAS; LINDA GRIEGO; MEL KARMAZIN; JOHN L. MUETHING; SUMNER M. REDSTONE; and LARRY J. ZINE, | **3 - 0 5 C V 2 2 1 3 - N** |
| Defendants. | |

## NATURE OF THE ACTION

1.    This is a securities fraud class action brought on behalf of all those who acquired shares of Blockbuster, Inc. ("Blockbuster" or the "Company") pursuant to the Company's exchange offer of Viacom, Inc. ("Viacom") stock for 144 million common shares of Blockbuster (the "Exchange Offer"), and on behalf of those who purchased Blockbuster shares in the open market between September 8, 2004 and August 9, 2005, inclusive (the "Class Period"). This action seeks to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act"), and the Securities Act of 1933 (the "Securities Act").

2.    The Exchange Offer was pursuant to a Prospectus-Offer to Exchange, dated September 8, 2004, incorporated by reference to Blockbuster's Amendment No. 3 to Registration Statement on Form S-4 (File No. 333-116617), filed with the Securities and Exchange Commission ("SEC") on September 8, 2004 (referred to collectively herein as the "Prospectus").

3. In the Prospectus, and throughout the Class Period, defendants, faced with new competition from online video retailers such as NetFlix, Inc. ("NetFlix"), stated that Blockbuster planned to transform itself "from a place where you go to rent a movie to a brand where you go to rent, buy or trade a movie or game, new or used, pay-by-the-day, pay-by-the-month, in-store or online." The transformation was to be achieved through a series of initiatives: Blockbuster Online (Internet sales); Movie Pass (in-store movie subscription); Game Pass (in-store game subscription); and "No More Late Fees." Defendants warned investors that the transformation would require heavy investment but assured them that "the steady operating cash flow from our core rental business has provided us with the ability to invest in new initiatives."

4. As set forth herein, defendants failed to disclose that Blockbuster was wholly unprepared to build the technological infrastructure required to integrate its in-store and online sales operations and otherwise execute the Company's transformation. Moreover, the Company's core in-store rental operations were not generating sufficient cash flow to fund Blockbuster's investment in "new initiatives." The truth began to emerge on August 9, 2005, when, before the market opened, the Company reported: (a) a second-quarter net loss of $57.2 million, or $0.31 per share --- well below Company-guided analyst estimates; (b) negative free cash flow of $118 million compared to positive free cash flow of $23 million in the second quarter of 2004; and (c) that it was abandoning its 2005 guidance. The Company also announced that, on August 8, 2005, it had been forced to amend its credit facility to provide for a waiver of its leverage ratio covenants. After this announcement, the Company's stock opened that morning at $7.05, down 11.9%, or $0.96 from the previous day's closing price of $8.01. The stock continued to decline as the market absorbed the full impact of the announcement, falling to a six-year low of $6.30 on August 10, 2005.

2

5.     Subsequently, on October 26, 2005, the Company essentially conceded that it did not have sufficient cash to fund its initiatives, announcing that it had met with its lender group to discuss modifications to its credit agreement, "that would give the Company improved operating flexibility over the term of the original credit agreement" and that the Company would "pursue raising additional capital that will be used for working capital purposes including debt reduction." On November 8, 2005, the Company announced in an SEC filing that it could be forced into bankruptcy protection if a credit-pact amendment with creditors did not become effective, and stated that "a very large majority" of its assets already are pledged as collateral on loans and creditors are imposing stricter terms.

6.     As a result of defendants' wrongful acts and omissions, and this precipitous decline in the market value of Blockbuster securities, plaintiffs and other class members who purchased such Blockbuster securities during the Class Period have suffered significant losses and damages.

## JURISDICTION AND VENUE

7.     Jurisdiction is conferred by § 22 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77v, and § 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78aa and 28 U.S.C. § 1331. The claims asserted herein arise under §§ 11, 12(a)(2) and 15 of the Securities Act, §§ 77k and 77o, and rules promulgated thereunder by the SEC, and §§ 10(b) and 20(a) of the Exchange Act [15 U.S.C. § 78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. § 240.10b-5].

8.     Venue is proper in this District pursuant to Section 22 of the Securities Act, Section 27 of the Exchange Act and 28 U.S.C. Sections 1391(b), 1337 and 27 [15 U.S.C. Section 78aa]. Many of the acts and practices complained of herein also occurred in substantial part in this District and Blockbuster maintains its principal place of business in this District.

9.     In connection with the acts alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

10.     Plaintiff Congregation Ezra Sholom purchased or otherwise acquired the common stock of Blockbuster in connection with the 2004 Viacom Exchange Offer or thereafter in the open market at artificially inflated prices during the Class Period, as detailed in the attached certification, and was damaged thereby.

**Corporate Defendants**

11.     Defendant **BLOCKBUSTER** is a Delaware corporation with its principal place of business and chief executive offices located at 1201 Elm Street, Dallas, TX 75270.  According to the Company's profile, Blockbuster and its subsidiaries engage in the operation and franchise of entertainment-related stores in the United States and internationally.  The Company offers prerecorded videos, as well as video games, for in-store rental, sale and trade, and also sells other entertainment-related merchandise.  As of December 31, 2004, the Company operated approximately 9,100 stores.

12.     The Company also operates Blockbuster Online, an Internet service that allows customers to rent movies over the Internet for home delivery by mail. The Company was founded in 1985.

13.     Defendant **NATIONAL AMUSEMENTS, INC.** ("National Amusements") is a closely held corporation that owns and operates approximately 1,425 movie screens in the United States ("U.S."), the United Kingdom ("U.K."), South America and Russia and manages 21 movie screens in the U.S. and the U.K.  Defendant Sumner M. Redstone is the controlling shareholder

of National Amusements. National Amusements, through its wholly owned subsidiary, NAIRI,

Inc. beneficially owns Class A Common Stock of Viacom representing approximately 71% of

the voting power of all classes of Viacom's Common Stock, and approximately 12% of the

Company's Class A Common Stock and Class B Common Stock on a combined basis. National

Amusements is headquartered in Needham, Massachusetts.

14.     Defendant **VIACOM** is a Delaware corporation with its principal place of

business located at 1515 Broadway, New York, NY 10036. Viacom is a worldwide

entertainment and publishing company that also produces television programming and movies.

Before the Exchange Offer, Viacom held 144 million Class B, non-trading Blockbuster shares,

each of which was entitled to five votes. By virtue of its Class B share ownership, Viacom

controlled 95% of the voting stock of Blockbuster, and Viacom and its representatives on the

Blockbuster board controlled and dominated the affairs of Blockbuster.

15.     On February 10, 2004, Viacom announced that it intended to divest itself of its

majority interest in Blockbuster in what it characterized as a "tax free splitoff" (the "Splitoff").

In connection with the Splitoff, Viacom declared a dividend of $5 per share, payable September

3, 2004, to Blockbuster shareholders of record at the close of business on August 27, 2004. As

the owner of 147,600,352 shares of Blockbuster Class A common stock, Viacom received a total

Blockbuster dividend of *$738,001,760* ($5 per Blockbuster common share).

**Individual Defendants**

16.     Defendant **JOHN F. ANTIOCO** ("Antioco") was, at all relevant times, Chairman

and Chief Executive Officer of Blockbuster. Antioco signed the Prospectus.

17.     Defendant **RICHARD J. BRESSLER** ("Bressler") was, at all relevant times until

the Splitoff, a director of Blockbuster and the Senior Executive Vice President and Chief

Financial Officer of Viacom. Bressler signed the Prospectus.

5

18.     Defendant **JACKIE M. CLEGG** ("Clegg") was, at all relevant times, a director of Blockbuster. Clegg signed the Prospectus.

19.     Defendant **PHILLIPPE P. DAUMAN** ("Dauman") was, at all relevant times until the Splitoff, a director of Blockbuster and a director of Viacom. Dauman signed the Prospectus.

20.     Defendant **MICHAEL D. FRICKLAS** ("Fricklas") was, at all relevant times until the Splitoff, a director of Blockbuster and the Executive Vice President, General Counsel and Secretary of Viacom. Fricklas signed the Prospectus.

21.     Defendant **LINDA GRIEGO** ("Griego") was, at all relevant times, a director of Blockbuster. Griego signed the Prospectus.

22.     Defendant **JOHN L. MUETHING** ("Muething") was, at all relevant times, a director of Blockbuster. Muething signed the Prospectus.

23.     Defendant **SUMNER M. REDSTONE** ("Redstone") was, at all relevant times, Chairman and Chief Executive Officer of Viacom and, until the Splitoff, a Director of Blockbuster. Redstone is also the Chief Executive Officer and Chairman of the Board of Directors of National Amusements, which beneficially owns shares of Viacom common stock representing approximately 71% of the voting power of all outstanding shares of Viacom stock. Redstone signed the Prospectus. Redstone, through his ownership interest in Viacom, was the major beneficiary of the $5 per share special dividend.

24.     Defendant **LARRY J. ZINE** ("Zine") was, at all relevant times, Chief Financial Officer of Blockbuster.

25.     Defendant **MEL KARMAZIN** ("Karmazin") was, at all relevant times until the Splitoff, a Blockbuster director. Karmazin served as President and Chief Operating Officer of

Viacom until his resignation on June 1, 2004. Prior to the Split-off, Karmazin owned 4,045,258

shares of Blockbuster common stock, which entitled him to receive a total Blockbuster dividend

of *$20,226,290* ($5 per Blockbuster common share) payable September 3, 2004, in connection

with the Splitoff, to Blockbuster shareholders of record at the close of business on August 27,

2004.

26.     The defendants identified in ¶¶ 16-25, above, are referred to herein collectively as

the Individual Defendants. The Individual Defendants, together with Blockbuster, are referred to

collectively herein as the Blockbuster Defendants.

27.     Because of the Individual Defendants' positions with Blockbuster and/or Viacom,

they had access to the adverse undisclosed information about Blockbuster's true financial

condition and Blockbuster's present and future business prospects, *via* access to internal

corporate documents (including the Company's drafts and final copies of Blockbuster's press

releases and the Prospectus, as well as the operating plans, budgets, forecasts and reports of

operations prepared by defendants, conversations and connections with other corporate officers

and employees, attendance at management and/or Board of Directors meetings and committees

thereof and *via* reports and other information provided to them in connection therewith.)

28.     It is appropriate to treat the Individual Defendants as a group for pleading

purposes and to presume that the false, misleading and incomplete information conveyed in the

Company's public filings, press releases and other publications as alleged herein are the

collective actions of the narrowly defined group of defendants identified above.

29.     Each of the above officers and/or directors of Blockbuster and/or Viacom, by

virtue of their high-level positions with Blockbuster and/or Viacom, and by virtue of Viacom's

controlling interest in and over Blockbuster, directly participated in the management of the

Company, was directly involved in the day-to-day operations of Blockbuster at the highest levels and was privy to confidential proprietary information concerning the Company, its intellectual property, business, growth, and financial prospects, as alleged herein. Said defendants were directly involved in drafting, modifying, supplementing, producing, reviewing and/or filing Blockbuster's false and materially misleading Prospectus, as well as the Company's other financial statements filed with the SEC. Throughout the Class Period, defendants were aware or recklessly disregarded that the false and misleading statements were being issued regarding the Company and defendants approved or ratified these statements in violation of the federal securities laws.

30.     As officers and/or directors and controlling persons of a publicly held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, traded on the New York Stock Exchange (the "NYSE"), and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate promptly, accurate and truthful information with respect to the Company's financial condition, business, products, markets, growth, and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's common stock would be based upon truthful and accurate information. Moreover, the misrepresentations and omissions by certain of the Individual Defendants' during the Class Period, identified herein, violated these specific requirements and obligations.

31.     Moreover, certain of the Individual Defendants participated in the drafting, preparation, and/or approval of the various public, shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially

8

false and misleading nature. Because of their Board membership and/or executive and managerial positions with Blockbuster and/or Viacom, and because of Viacom's controlling interest in Blockbuster, each of the Individual Defendants had access to the adverse undisclosed information about Blockbuster's financial condition and performance prior to the Exchange Offer, as particularized herein, and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about Blockbuster and its financial condition and operational safeguards and controls issued or adopted by the Company in the Prospectus, and thereafter, materially false and misleading.

32.    The Individual Defendants, because of their positions of control and authority as officers and/or directors of Blockbuster and/or as officers and/or directors of Viacom, which dominated and controlled the Company prior to the Exchange Offering, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period. Prior to the Exchange Offer, each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance, including draft copies of the Prospectus issued in connection with the Exchange Offer, and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is responsible for the accuracy of the Prospectus and certain of the Individual Defendants are also responsible for other public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

33.    Moreover, certain of the Individual Defendants, including defendants Antioco and Zine, are liable as participants in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Blockbuster common stock by disseminating materially false

and misleading financial statements. In addition, each of the Individual Defendants is also strictly liable for the false and materially misleading statements contained in the Prospectus.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

34. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class consisting of all persons who acquired Blockbuster shares pursuant to the Company's exchange offer of Viacom, Inc. ("Viacom") stock for 144 million common shares of Blockbuster (the "Exchange Offer"), and on behalf of those who purchased Blockbuster shares in the open market between September 8, 2004 and August 9, 2005, inclusive. Excluded from the Class are defendants, the officers and directors of the Company, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

35. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Blockbuster common shares were actively traded on the NYSE. Following the Exchange Offer, Blockbuster had approximately 189.8 million shares of common stock issued and outstanding. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Blockbuster or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

36. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

37.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

38.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)     whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the Company's financial condition and its financial statements;

(c)     the true business, operations and likely foreseeable near-term future growth and prospects for the Company;

(d)     whether defendants had issued a false and materially misleading Prospectus in connection with the 2004 Exchange Offer and Splitoff transaction; and

(e)     to what extent the members of the Class have sustained damages and the proper measure of damages.

39.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## BACKGROUND TO THE CLASS PERIOD

40.     Blockbuster was founded in 1985. On August 16, 1999, Blockbuster completed the initial public offering of 31 million shares of Class A common stock, representing approximately 18% of its total shares outstanding and about 4% of the total voting power of the Company. Following the IPO, Viacom, as a result of its ownership of 144 million shares of Blockbuster Class B common stock outstanding, retained approximately 82.3% of the total equity value in, and approximately 95.5% of the total voting power of, Blockbuster. By 2004, Blockbuster was under very significant pressure from: (a) declining overall sales in the DVD retail rental market; (b) increased competition from mass market discount retailers, such as Wal-Mart, which lowered the purchase price of DVDs; (c) increased competition from online, Internet retailers, such as NetFlix.com; and (d) customer dissatisfaction with "late fees" and other charges.

41.     It was against this backdrop that Viacom announced, on February 10, 2004, that it intended to divest itself of its majority interest in Blockbuster in what it characterized as a "tax free splitoff" (the "Splitoff"). The release stated, in pertinent part, as follows:

> The Company also announced that its Board of Directors has authorized the Company to pursue the divestiture of Viacom's approximately 81% interest in Blockbuster, based on the conclusion that Blockbuster would be better positioned as a company completely independent of Viacom. The Company anticipates that the divestiture would be achieved through a tax-free split-off, but will also continue to consider other alternatives. The transaction is subject to further approval of the Viacom Board and an assessment of market conditions. The split-off, which would result in a reduction of Viacom's outstanding shares, is expected to be completed by mid-2004.

42.     On February 10, 2004, Blockbuster issued a statement on the divestiture that quoted defendant Antioco as follows:

> John Antioco, Blockbuster's Chairman and CEO said, "We believe Blockbuster will compete very effectively as an independent

12

company and that separation from Viacom will enable us to better pursue our unique strategic vision and significant avenues for expansion. With our brand, our cash flow, and our growth opportunities, we are convinced that the prospects for our business are exceptionally strong."

43.     In the months that followed, defendants continued to state that Blockbuster's prospects are "exceptionally strong" due to its brand name and strong cash flow.   On July 22, 2004, when Blockbuster reported revenues and quarterly net income of $0.26 per share, defendant Antioco clearly stated that the Company was successfully transitioning from a "video rental company" to an "entertainment destination," and that "we remain on track or ahead of schedule with all our strategic initiatives."

44.     On August 11, 2004, Blockbuster issued a news release in which it announced the launch of Blockbuster Online with the claim that the new service "combined with our marketing savvy, should help Blockbuster to develop a substantial share of the online rental business by the end of next year."   The Internet service purportedly allowed customers to rent unlimited DVDs by mail, up to three at a time, for the initial cost of $19.99 per month.[1]   The Company claimed that its planned integration of its 9,500 Blockbuster outlets with Blockbuster Online would give the Company a unique advantage.   In this regard, the release stated as follows:

> "We think now is the opportune time for Blockbuster to enter the online rental business, and we plan to quickly establish ourselves in this arena by aggressively marketing, pricing and combining our online program and in-store capabilities," said Shane Evangelist, Blockbuster vice president and general manager of BLOCKBUSTER Online. "Very simply, we plan on providing the best online movie rental service available. To this end, the BLOCKBUSTER Online monthly fee is currently priced below our biggest competitor for the three-out rental plan. Plus, we are offering 25,000 new release and catalog titles. We believe that all of this, combined with our marketing savvy, should help

---

[1] Other service plans included 5 DVD's out at a time for $29.99 per month or 8 out at a time for $39.99 per month.

Blockbuster to develop a substantial share of the online rental business by the end of next year."

In a first step designed to integrate its online offering with the BLOCKBUSTER store network, as well as appeal to the 40 percent of current online renters who continue to rent at a retailing establishment, BLOCKBUSTER Online will offer subscribers two free in-store movie rental coupons each month.

In late May 2004, Blockbuster launched its store-based movie subscription program, the Blockbuster Movie Pass, nationwide. ***Blockbuster plans to combine its online and store-based subscription programs in 2005.***

***"The full integration of our online and in-store programs planned for next year will enable us to provide our customers – old and new alike – with unmatched convenience, service, selection and value," said Evangelist. "If a customer is in our store and wants to return a movie they rented online, we'll be able to accommodate them. If a member rents primarily in-store, but wants a hard-to-find title we don't typically carry in store, they'll be able to go online and get it. It's a matter of maximizing convenience and choice.***

***"It will be difficult for any store-based or online retailer to replicate our business model because we'll be able to leverage our extensive U.S. store network as distribution points, which should significantly expand our 25,000 title inventory, allow for next-day delivery capability and maximize convenience for our customers – all while enhancing our operating margins and furthering our market leadership."***

To reach and attract Internet users to the new online offering, BLOCKBUSTER Online has formed marketing alliances with two of the leading Internet service providers – MSN and AOL. These alliances will allow BLOCKBUSTER Online to reach approximately 75 percent of the U.S. Internet audience. Initially, MSN and AOL will promote the BLOCKBUSTER Online service through banner ads and promotional links. However, within months, BLOCKBUSTER Online users will be able to conveniently add and manage their movie queue from MSN and AOL. This is the first in a series of moves by BLOCKBUSTER Online to give customers the ability to access their movie queue from multiple locations. [Emphasis added.]

45.     In connection with the Exchange Offer, on August 20, 2004, defendants

announced that the Board of Directors of Blockbuster had declared a "special cash dividend" of

$5.00 cash per share of common stock, payable September 3, 2004, to stockholders of record at

the close of business on August 27, 2004. According to defendants' release, the special dividend
was financed from the net proceeds of a $300 million 9% senior subordinated note offering, due
2012, and the borrowings of $650 million in term loans under a new $1.15 billion bank credit
facility, both of which closed the same day as defendants' announcement of the dividend.
Because Viacom owned 81.5% of the common stock of Blockbuster at that time, the special
dividend resulted in a cash payment of $738 million directly to Viacom.

46.     Payment of the special dividend immediately reduced the price of Blockbuster
shares from approximately $13.00 per share to $8.00 per share and caused Blockbuster, which
had been virtually debt free, to incur approximately $900 million of debt, net of cash. Prior to
the close of the Exchange Offer, defendant Antioco publicly stated that this additional debt
would not adversely impact the Company, and Antioco was quoted in the *Financial Post* as
stating that Blockbuster carried less debt than it did at the time of its 1999 IPO and that, "*We
have enough financial flexibility to carry out our mission.*"

47.     On September 8, 2004, Viacom published a news release announcing that it had
commenced the Exchange Offer. The release stated as follows:

> Viacom Inc. (NYSE: VIA and VIA.B) today announced that it has
> commenced an offer to its stockholders for the exchange, on a tax-
> free basis, of some or all of their shares of Viacom stock for shares
> of Blockbuster Inc. (NYSE: BBI) held by Viacom. Assuming the
> exchange offer is fully subscribed, Viacom will dispose of its
> entire ownership interest in Blockbuster, which currently totals
> approximately 81.5% of Blockbuster's outstanding shares.
>
> Under the terms of the offer, each holder of Viacom Class A
> Common Stock and Viacom Class B Common Stock will receive
> 5.15 shares of Blockbuster stock, consisting of 2.575 shares of
> Blockbuster Class A Common Stock and 2.575 shares of
> Blockbuster Class B Common Stock, in exchange for each Viacom
> share tendered. Viacom will accept pursuant to the offer up to an
> aggregate of 27,961,165 shares of Viacom Class A and Class B
> common stock. The exchange offer will expire at 12:00 midnight,
> New York City time, on October 5, 2004. The terms and

conditions of the exchange offer are more fully described in a Blockbuster Registration Statement on Form S-4 and a Viacom Schedule TO being filed with the Securities and Exchange Commission today.

Under the terms of the offer, a shareholder accepting the offer would receive shares of Blockbuster Common Stock with a value, based on closing market prices on September 7, 2004, representing a premium of approximately 19.2% over the closing price on that date of a share of Viacom Class B Common stock. The premium over the price of a share of Viacom Class A Common Stock on that date would be 17.6%. The actual premium will differ depending on changes in market prices through the consummation of the offer and the price of Blockbuster Class B Common Stock at the time the Blockbuster Class B Common Stock begins to trade.

Viacom currently owns 144 million shares of Blockbuster Class B Common Stock, representing all of the outstanding shares of Blockbuster Class B Common Stock. Subject to the satisfaction of certain conditions to ensure the tax-free nature of the exchange offer, Viacom will convert 72 million shares of Blockbuster Class B Common

48.     In connection with the Exchange Offer, defendant Antioco would also receive an annual salary of $1.25 million, up to 2.5 million shares of restricted shares and up to 5 million stock options under a new employment agreement.

## MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD

49.     The Exchange Offer was made pursuant to the Prospectus, which contained materially false and misleading statements. One part of the Prospectus was a "Letter From Blockbuster Chairman & CEO John Antioco" addressed to Viacom shareholders that, among other things, falsely stated that the purpose of the Exchange Offer was to make Blockbuster a stronger Company, and falsely assured investors that the Company had sufficient cash flow from core operations to fund its initiatives without taking on additional debt. The letter stated, in pertinent part, as follows:

As you consider this exchange offer being made by Viacom, I want to take this opportunity to summarize my personal vision for

16

Blockbuster. Whatever the competitive set—mass merchants, "rentailers," game boutiques or online rental services— *Blockbuster plans to set itself apart from the competition by transforming itself from a place where you go to rent a movie to a brand where you go to rent, buy or trade a movie or game, new or used, pay-by-the-day, pay-by-the-month, in-store or online.* When we achieve this vision, I believe Blockbuster will be a multi-dimensional, highly differentiated and highly profitable home entertainment brand. We see the opportunity for the future growth of Blockbuster. We also see the challenges that face our company and our business, which we have discussed in the Prospectus-Offer to Exchange. As you consider Viacom's exchange offer, please take the time to read and consider the entire Prospectus-Offer to Exchange.

*Two years ago Blockbuster announced its new corporate mission statement: "to be a complete source for movies and games." Since that time, we have come a long way in redefining BLOCKBUSTER® as a place where customers can not only rent movies and games, but also buy and trade them as well.*

*Given Blockbuster's ongoing transformation from a "rentailing-only" company into a specialty retailer of home entertainment, we believe now is an appropriate time for us to separate from Viacom.* Over the course of the past ten years, Viacom has been a supportive majority stockholder, but as Blockbuster has moved to participate on a broader scale in the home entertainment retailing marketplace, we have moved away from the core media business of Viacom.

Blockbuster and Viacom have different competitive strengths, different operating philosophies, and different strategies designed to achieve future growth. However, Blockbuster and Viacom are united in the belief that a split-off of Blockbuster from Viacom will enable each company, respectively, to better focus its managerial and financial resources.

**A brief history of Blockbuster's transformation**

As a fully independent company, we are looking forward to accelerating our transformation into a specialty retailer of home entertainment. We began this transformation process in 2002 when we established Blockbuster in a much more significant way in the movie retailing business. At that time, we increased our retail movie inventory, merchandising presence and advertising, and implemented various retail sales promotions. It was all part of a plan to have customers notice that there was something new at Blockbuster, and notice they did. We were successful at

establishing Blockbuster as a movie retailer, as well as a "rentailer."

Our mission didn't change in 2003. We continued to dedicate ourselves to expanding our movie and game offerings, and to accomplishing this transformation more profitably by improving gross margins, reducing low-profit transactions, reducing advertising expenditures and refining marketing programs to give us a better return on investment. ***This focus on profitability played a central role in our efforts to transform Blockbuster, as the steady operating cash flow from our core rental business has provided us with the ability to invest in new initiatives.*** Specifically, these new initiatives are rental subscription programs (both in-store and online), movie and game trading, and video game concepts.

********

Our plan going forward is to capture a larger share of the domestic rental market and drive more rental customers into our stores through a combination of marketing, promotion, and new rental offerings. As a result, we intend to be able to expose a growing number of customers to our expanding number of new offerings with the goal of increasing the size and number of our transactions and, eventually, our profitability.

To accomplish all of this, we intend to reinvent the way people rent home entertainment, and we intend to do this through our rental subscription programs—both in-store and online.

In late May of this year, we began offering on a national basis the BLOCKBUSTER MOVIE PASS™, our store-based movie subscription program that we have been testing in multiple markets since the summer of 2002. For a flat monthly fee, the movie pass allows customers to rent an unlimited number of movies, two or three at a time, without return dates or extended viewing fees for as long as they subscribe to the pass. We see the movie pass as a key means of increasing our rental traffic in a tough rental market. Our goal is to have 8% of our active monthly members on the service by the end of this year and 10% of our active monthly members paying us a monthly fee by the end of 2005.

As for renting movies online, we see this as a sizable opportunity that can contribute to our long-term profitability. As a defensive strategy, we don't want customers, who are interested in renting online, going anywhere else for their movies. As an offensive move, we think online rentals could represent new customers for us because many potential subscribers live outside the proximity of a BLOCKBUSTER store.

To begin serving these potential online customers, we launched an online rental service in the United Kingdom in mid-May, and launched BLOCKBUSTER Online™, our online rental service in the United States, in August. Our plan is to utilize the full power of our globally recognized brand, our marketing ability, our rich customer database and the promotional opportunities afforded by our store network to gain as many subscribers as possible. *We see no reason why we can't have a substantial share of the online rental transactions by the end of next year. We are also proceeding with our plans to merge our U.S. in-store and online subscription programs in 2005. This integrated approach should give our customers the best of both worlds—the ability to rent or return movies by mail or at their local BLOCKBUSTER store.*

**The movie and game trading business—a new growth opportunity**

Another opportunity we are aggressively pursuing and plan to have in place in 2004 is movie and game trading. *We believe movie and game trading at Blockbuster represents a significant source of future incremental revenues.* Many of the DVDs purchased in the United States last year were previously viewed, and Blockbuster is already the nation's largest retailer of used DVDs. We believe that our customers, who are already accustomed to buying previously rented DVDs from us, will be interested in selling and buying previously owned DVDs at Blockbuster as well.

*******

We first offered the concept of movie trading at our stores during the holiday season of 2003 with our Big DVD Trade-In promotion that gives customers the opportunity to trade in a used DVD and purchase a popular, new title for a reduced price. Also, we have been testing a more comprehensive trading model that enables customers to receive store credit for their used DVDs, which can be used for anything in our stores—movies, games or merchandise.

While our trading program is still in its early stages, we believe a strong demand for DVD trading will emerge as consumers learn that trading is a smart, economical way to refresh their movie libraries or monetize their collections. *So movie trading is one more benefit we can offer our customers, one more way we can leverage our existing store locations and store traffic and one more way we can differentiate Blockbuster from traditional retailers.*

We have tested the trading market since 2002 with the acquisitions of Movie Trading Company and GAMESTATION®, which are freestanding trading store chains. *We intend to have movie and*

19

*game trading available in more than 2,000 of our U.S. stores and all of our 700-plus U.K. stores by the end of 2004.*

*******

### In summary

The home entertainment market has changed significantly in the past few years, largely due to the emergence of retail-priced DVD, the resulting competition from mass merchants and the increasing availability of other entertainment options. These changes have presented our industry with challenges; however, they have also presented us with new opportunities, including rental subscription programs, online and in-store, movie and game trading, and games store-in-stores, which have the potential to contribute significantly to our operating profits.

All of these initiatives require financial investment. Investment in new information technology systems, store facilities, new processes to ensure employee productivity, marketing, incentives for store personnel, aggressive promotions, and much more. These initiatives also require investments of people resources and a lot of hard work. In short, our transformation will not be easy.

I believe we are up to the challenge and that we will be better equipped to achieve our goals as an independent, stand-alone company rather than as a subsidiary of Viacom. Blockbuster is a great brand and a great retailing concept. We have approximately 9,000 stores worldwide. We have a plan in place that should allow us to grow our business, and I believe we have the management team, the employees and the franchisees that will enable us to transform Blockbuster into the complete source for movies and games. [Italicized emphasis added.]

> Sincerely,
> /s/ John Antioco
> JOHN ANTIOCO

50.    The Prospectus also stated that Viacom had decided to separate itself from

Blockbuster because *"[e]ach company believes that the separation of Blockbuster from Viacom*

*will produce numerous corporate benefits to itself and the other company,"* the most important

of which include:

> •    **Facilitate Viacom's and Blockbuster's Respective Expansion and Growth**. Viacom and Blockbuster have

significantly different competitive strengths and operating strategies, and each company believes *that the separation of Blockbuster from Viacom, which is referred to in this Prospectus-Offer to Exchange as the "split-off," will strengthen its ability to focus its managerial and financial resources on developing and growing its core businesses.* Viacom is a diversified, broad-based media business, and desires to emphasize capital investment opportunities in its core businesses, rather than investing capital in initiatives that would enhance Blockbuster's growth. Blockbuster is in the rental and retail home video and game industry and shares many more characteristics with other retailers than with Viacom's other businesses. Blockbuster has a number of strategic initiatives that it is currently pursuing in response to industry changes. For example, Blockbuster has plans to expand its rental subscription programs and to continue to develop its games concepts and its movie and games trading model. Execution of these initiatives will move Blockbuster's business further away from Viacom's areas of strategic focus.

• **Resolve Appearance of Competitive Conflicts Involving Blockbuster and Paramount Pictures**. Paramount Pictures Corporation, a Viacom subsidiary, is in the motion picture business and competes with other movie studios. As a result, *Blockbuster believes that the other movie studios, which supply Blockbuster with its movies, consider Blockbuster's affiliation with Paramount Pictures to be a conflict of interest*. Similarly, because Paramount Pictures supplies movies to Blockbuster's competitors in the video rental market, *Viacom believes that Blockbuster's competitors, who are customers of Paramount Pictures, view Paramount Pictures as having a conflict of interest. The split-off should eliminate these perceived competitive conflicts.*

• **Facilitate Investment Decisions by Stockholders.** *Following the split-off, it will be easier for potential investors to assess Viacom and Blockbuster on an independent basis and choose the company in which to invest and in what relative percentages.* The split-off is expected to enable Viacom stockholders who currently own an indirect interest in Blockbuster through Viacom to convert their investment to a direct ownership of Blockbuster in a tax-efficient manner. [Italicized emphasis added.]

51.     Unbeknownst to the class members who tendered their Viacom shares in

exchange for Blockbuster stock pursuant to the Exchange Offer, the Prospectus issued in

connection with the Exchange Offer was materially false and misleading for, among other reasons, the following:

      (a)     The Splitoff and payment of the special dividend left Blockbuster without the financial resources required to implement the strategic plan it presented to investors and thereby achieve the transformation required to ensure Blockbuster's success in the changing rental and retail market for DVDs and video games;

      (b)     The Company was dependent on nearly ten-year-old Digital Equipment Corp. Alpha servers that were incapable of supporting the "No More Late Fees" program and the revenue and inventory tracking that would be required by the integration of the Company's online and in-store operations. Consequently, there was no reasonable basis for the Company's statement that its in-store and online operations would be integrated in 2005;

      (c)     The Company was experiencing substantial difficulties launching its in-store DVD trading program, which was designed to allow Blockbuster customers to trade used DVDs with Blockbuster. This business was subject to the same record-keeping regulations that governed pawnshops, and required that the Company keep records of who was trading and how much. The regulations were slightly different in each state, and the Company lacked the systems required to collect such data and ensure compliance in each state in which it operated these businesses; and

      (d)     The real reason for the Exchange Offer was not to benefit Blockbuster but rather, to allow defendant Viacom to reap hundreds of millions of dollars in proceeds from the pre-Exchange Offer Special Dividend, and then to use the Exchange Offer to reduce the public float of Viacom, such that Viacom would benefit from the Exchange Offer at the expense of, and with reckless disregard for, Blockbuster.

52.     Immediately following the completion of the Exchange Offer defendants made a series of announcements that first began to alert investors that defendants had failed to disclose important information about the Company prior to the Exchange Offer.  The first disclosure came on or about October 19, 2004, when investors learned that Blockbuster was suddenly engaged in a "price-war" with online DVD rental competitor NetFlix.  Accordingly, within one week of NetFlix cutting its monthly subscription fee to $17.99, Blockbuster announced that it would cut its fee to $17.49 per month.  The Company's immediate reaction to NetFlix's actions leads to the reasonable conclusion that defendants had *already* planned to engage in a price war with other online competitors and that this "price-war" strategy existed at Blockbuster *prior to* the Splitoff.

53.     Despite the fact that lowering of online subscription prices had an adverse impact on the Company's revenues and earnings, defendants continued to state that the Company remained on track to achieve defendants' stated goals.  Particularly important at that time was investors' continued belief that the price reduction in Blockbuster's online subscriptions would not adversely impact the Company because, by 2005, Blockbuster's online operations would be merged with the Company's retail operations, such that the anticipated synergies would offset any expected revenues or earnings.

54.     Later, on October 27, 2004, when defendants announced results for the third quarter of 2004, defendants posted a loss of $1.42 billion primarily as a result of a $1.5 billion non-cash charge related to the write-down of intangible assets, primarily goodwill, following the Exchange Offer.  Even excluding this charge, the Company earned only $3.4 million during 3Q:04, or $0.02 per share, which was well below the consensus estimate of $0.12 per share forecast by analysts in a First Call survey.  Defendants also revealed that profits for the fourth

quarter and full year 2004 would "decline significantly" and that Blockbuster President and

Chief Operating Officer, Nigel Travis, had resigned.

55. The Company's October 27, 2004 release also provided guidance that was

substantially lower than defendants' guidance prior to the Exchange Offer. In this regard, the

Release stated, in part, the following:

> **Fourth Quarter and Full Year 2004 Business Outlook**
>
> The following are the Company's current expectations for the fourth quarter and full year 2004 results of operations.
>
> \*      *The Company expects profitability for the fourth quarter of 2004 to decline significantly from last year based on an estimated low-single digit percentage decline in worldwide same-store revenues, a significant year-over-year increase in operating expenses associated with the development and launch of the key growth initiatives, an anticipated compensation charge ranging from $60 to $80 million associated with an employee stock option exchange offer and higher interest expense resulting from the assumption of debt as a result of payment of the special distribution to stockholders in September 2004.* Worldwide same-store revenues will be affected by continued weakness in the rental industry which will be further impacted by both Christmas and New Year's holidays occurring on a weekend. This impact will be partially offset by revenues from the new initiatives.
>
> \*      *The Company expects the percentage increase in total revenues for the full-year 2004 to be in the low-single digit range* as a result of favorable impact of foreign exchange and growth in the store base.
>
> \* \* \*
>
> \*      *Profitability for the full-year 2004 will decline significantly because of the goodwill impairment charge, the accelerated initiative investment, continued weakness in the rental business, the anticipated charge associated with the employee stock option exchange offer and higher interest expense associated with the additional $950 million in debt.* As a result, the Company's prior guidance for an approximately 30% decrease in 2004 diluted earnings per share from adjusted diluted earnings per share of $1.48 for the full-year 2003 is no longer relevant and year-over-year results are not comparable.
>
> \* \* \*

24

**Full Year 2005 Business Outlook**

> The Company expects the rental industry to continue to decline in 2005, but believes the rental industry will stabilize by the end of 2005 as DVD penetration is projected to reach 70% of U.S. households. Additionally, *the Company expects to continue to invest heavily in the business in 2005, which combined with projected softness in rental revenues, will adversely affect profitability for the full year 2005.* [Emphasis added.]

56.     Despite these disappointing results and the downward revision in guidance,

defendant Antioco stated that the Company had taken the "right steps to position Blockbuster for

future growth in both revenues and profits." In this regard, defendant Antioco was quoted in the

Company's release, in part, as follows:

> "We are excited about having successfully completed our divestiture from Viacom and are pleased with the significant progress we made during the quarter with our plan to transform Blockbuster from a 'retailer' into a complete source for movies and games," said John Antioco, Blockbuster Chairman and CEO. "In keeping with this plan, we successfully launched our online subscription program well ahead of schedule, exceeded our subscription expectations for both our in-store and online passes, and aggressively rolled out movie and game trading to thousands of stores. To support these initiatives, as indicated in our previous guidance, we accelerated investment spending and this, along with continued softness in the movie rental industry, impacted our profitability. However, *we believe we are taking the right steps to position Blockbuster for future growth in both revenues and profits.*" [Emphasis added.]

57.     Despite the apparent success of the Exchange Offer for Viacom, and despite the

positive "spin" that defendants placed on the Company's disclosures, unbeknownst to investors,

following the Exchange Offer the Company's prospects continued to seriously worsen – at a rate

far in excess of what defendants had disclosed. As an example of this, on or about December 22,

2004, defendants continued their online DVD price war and again announced another large

decrease in Blockbuster's online monthly rental subscription fees – a 14% price reduction, or

$2.50 per subscription, to $14.99 per month for Blockbuster's basic, online subscription plan.

This fee included all postage, did not entail late fees and provided subscribers two free in-store movie or game rentals per month.

58.     The Company's online price war impaired the Company's retail operations. Thus, as Blockbuster's antiquated information management systems would not allow the Company to coordinate its retail and online businesses, and because Blockbuster could not charge late fees for its online customers, by the end of the fourth quarter 2004, the Company was forced to abandon its in-store late fees, a lucrative source of revenues and profits.

59.     On March 9, 2005, Blockbuster issued a news release that announced the Company's financial results for the fourth quarter and year ended December 31, 2005. For 4Q:04, the Company reported very slim profits, with net income of only $0.9 million. For the full year, the Company reported a net loss of $1.256.1 billion, or $6.93 per diluted share, compared to a net loss in 2003 of $983 million, or $5.46 per diluted share. The Company reported free cash flow of $127.9 million down more than 100% from cash flow of $402.7 reported at year-end 2003.

60.     The Company's March 9, 2005 release also provided forward guidance for Blockbuster, in part, as follows:

> Business Outlook
>
> The following are the Company's current expectations for 2005:
>
> *       The percentage increase in total revenues for 2005 is expected to be in the low-single digit range over 2004 as a result of growth in active members and growth in the store base.
>
> *       For the full-year 2005, the Company projects that extended viewing fees would have contributed approximately $250 million to $300 million to operating income, which is expected to be offset by growth in revenues resulting from increased store traffic, less promotional and marketing activity, and increased focus on operating expense management.
>
> *       ***The Company expects operating income for the full-year 2005 to be flat with adjusted operating income for full-year 2004***

26

before the initial marketing and implementation costs of approximately $50 million associated with the launch of Blockbuster's "No Late Fees" policy and approximately $40 million in share-based compensation costs associated with the adoption of FAS 123R. However, operating income for the first quarter of 2005 will be reduced by approximately $80 million in projected operating income from extended viewing fees, approximately $60 million in operating costs for BLOCKBUSTER Online, and approximately $50 million in launch costs for "No Late Fees."

\*      In order to build on the initial success of BLOCKBUSTER Online, the Company will spend an incremental $70 million in 2005 to further accelerate subscriber growth. This incremental spend is expected to be offset with an SG&A reduction plan to be implemented across the company beginning in the second quarter of 2005. The total operating costs for BLOCKBUSTER Online for 2005 are expected to be approximately $120 million.

\*      Total capital expenditures for the full-year 2005 are expected to be approximately $150.0 million, compared with the $274.9 million recorded in 2004. This reflects fewer new store openings, fewer store remodels and fewer additions of freestanding and game store-in-stores. [Emphasis added.]

61.      In part, as a result of defendants' "surprise" revelations and accelerated spending following the Exchange Offer, on April 7, 2005, Carl Icahn, one of the Company's largest individual investors, who then held approximately 9% of Blockbuster's Class A common stock, sent a publicly-disseminated letter to defendant Antioco chastising him for accepting a $51 million pay package, seeking increased dividend payments and accusing Antioco of going on a "spending spree" with shareholder money.

62.      On April 18, 2005, defendant Antioco, with the acquiescence of the Blockbuster Board of Directors, responded to the April 7, 2005 Ichan letter with a materially false and misleading defense of the Company's strategy:

Dear Mr. Icahn,

The Board of Directors and I have reviewed the issues raised in your April 7, 2005, letter. We strongly object to your criticism and believe that it is both inaccurate and potentially misleading to our other shareholders.

27

*Since late 2003, Blockbuster has been following a well-planned and broadly communicated strategy that is essential to confront the significant challenges facing our industry.*  This strategy, which is designed to revitalize our core rental business and create alternative revenue sources, is working.  We believe abandoning this strategy would be shortsighted and could bring about a precipitous drop in our future cash flow from which there may be no recovery.

A key feature of our growth strategy is the recently introduced "End of Late Fees" program, which directly addresses the major problem customers had with their movie rental experience.  The program also positions us better to compete with home entertainment options that do not have late fees, including retail DVD, pay-per-view and VOD.  To date, the "End of Late Fees" program is producing the desired results.  Since the first of January when we introduced the program, we have had positive growth in active membership for the first time in nearly two years.

*Another critically important initiative - and the only significant investment we intend to make this year - is our online rental business.  Blockbuster is uniquely positioned to compete in this fast growing business.*  Given the views of leading industry experts that within three years online rental could represent 20% to 30% of movie rental revenues, it is imperative that we pursue this opportunity, which we believe will mean hundreds of millions of dollars in future operating income for our company.

Furthermore, your characterization of Blockbuster's essential investments in the business as a "spending spree" is simply wrong. We are prioritizing new initiatives, investing wisely for the future and cutting costs aggressively.  We have cut 2005 capital spending by over $100 million from last year and reduced corporate overhead by $70 million on an annualized basis.  Additionally, to reduce costs further and better focus our resources, we have put our game initiative, as well as the marketing of our movie trading business, on hold until 2006.

* * *

On a more personal note, the figure you reference in regards to my 2004 compensation is not correct as it takes into account compensation that has not yet been earned or paid.  Our independent directors and their advisors specifically designed my compensation package to achieve a payout over the next five years in order to align my interests with the interests of Blockbuster's shareholders.

In closing, Blockbuster is engaged in a strategy that requires tremendous focus and enthusiastic execution by all our employees.

The turmoil and uncertainty you have created threaten to distract the organization and jeopardize our success and could prove damaging to shareholder value.

The Board of Directors and I are committed to build and fight for the future of Blockbuster.

Sincerely,
/s/ John F. Antioco
Blockbuster Chairman & CEO

63. On March 29, 2005, Blockbuster filed with the SEC the Company's Form 10-K

for the year ended December 31, 2004. The Form 10-K stated, in pertinent part, as follows:

*During 2004 we (i) successfully launched BLOCKBUSTER ONLINE™, our U.S. online subscription program;* (ii) expanded our in-store subscription pass offering nationwide and significantly exceeded our in-store subscriber expectations and (iii) aggressively rolled out movie and game trading to thousands of stores. We believe that these strategic initiatives will provide growth opportunities for our business and complement our mature rental business, which continued to decline during 2004. Our total revenues and gross profit for 2004 were $6.1 billion and $3.6 billion, respectively. Of our revenues, 69.5% were generated in the United States and 30.5% were generated outside of the United States.

In October 2004, we completed our divestiture from Viacom Inc. *We believe that we will compete effectively as an independent company and that the separation from Viacom has better positioned us to pursue our unique corporate goals and growth opportunities.* [Emphasis added.]

64. On May 5, 2005, the Company reported a larger then expected loss in the first

quarter of 2005 relating, in part, to the launch of the Company's "No Late Fees" program.

According to the Company's release, net losses totaled $57.5 million, or $0.31 per share,

compared to earnings of $114.4 million, or $0.63 per share, a year ago. Total revenue during the

quarter increased only 3% to $1.55 billion from $1.50 billion last year. Analysts surveyed by

First Call had expected the Company to report losses of $0.28 per share during that period. At

that time, however, defendants continued to mislead investors as to the true financial health and

operations of the Company.

65.     The statements set forth in ¶¶ 55-56, 59-60 and 62-63 were materially false and misleading for the reasons stated in ¶ 51.

## THE TRUTH BEGINS TO EMERGE

66.     On August 9, 2005, shares of Blockbuster declined precipitously after the Company reported that it lost $57.2 million in the second quarter, the Company withdrew its full-year forecast, and stated that it had negotiated with lenders to prevent a high debt ratio from triggering default on a line of credit.  On this news, Blockbuster shares fell $0.92, or 11%, to close at $7.09 per share on the NYSE.  In the three months ended June 30, 2005, Blockbuster's loss grew to $0.31 per share, compared with profit of $48.6 million, or $0.27 per share, in the year-earlier period.  Analysts polled by First Call expected a loss of only $0.10 per share. Revenue for the quarter, reported at $1.4 billion, down 2% from $1.42 billion a year earlier, was also below analysts' target of $1.45 billion.

67.     The Company's much-touted decision to eliminate late fees led to a 5% decline in rental revenue, to $1.02 billion.  Late fees plunged from $159 million a year ago to $20.9 million.  Net cash flow provided by operating activities also decreased to $164.7 million, and free cash flow was negative $118.7 million, compared to $268.8 million and a gain of $23.0 million, respectively, reported in 2Q:04.  In addition, for 2Q:05 gross profits decreased 11.5%, rental gross profits decreased 13.0% and rental gross margins declined by 600 basis points.  The Company attributed these declines to lower gross margins from Blockbuster Online and the decreased revenues attributed to the elimination of late fees and subscription based memberships. Defendants also announced that the Company had raised the cost of its online subscription fees to $17.99, from its previous price of $14.99.

68.     Following these disappointing results, Arvind Bhatia, analyst at Southwest Securities, cut his rating on Blockbuster to "neutral" from "long-term buy."  In issuing this

downgrade, Bhatia summed up his conclusions about the Company, in part, by stating that, *"Though 2005 was expected to be a throwaway year, our long-term buy rating on BBI was predicated on our belief that 2006 earnings and cash flows would see a 'revival.' We question that now given the severely negative impact of the new initiatives on the margin side of the company's business.*"

69.     As a result of the poor performance of the Company, on September 2, 2005, defendants announced that they would not pay a dividend for the third quarter of 2005.    In addition, defendants also stated that it was not clear whether the Company would provide a dividend in later periods.   On November 8, 2005, the Company announced in an SEC filing that it could be forced into bankruptcy protection if a credit-pact amendment with creditors did not become effective, and stated that "a very large majority" of its assets already are pledged as collateral on loans and creditors are imposing stricter terms.

## UNDISCLOSED ADVERSE INFORMATION

70.     During the Class Period, the market for Blockbuster's common stock was open, well-developed and efficient.  As a result of defendants' materially false and misleading statements and failures to disclose Blockbuster's true financial condition, Blockbuster's common stock traded at artificially inflated prices at the time of the Exchange Offer and thereafter throughout the Class Period.  The artificial inflation continued until the time Blockbuster admitted and/or the market came to realize:

(a)     Defendants' claim that Blockbuster would integrate its online and in-store operations in 2005 was materially false and misleading.  Defendants knew or recklessly disregarded that the Company's nearly ten-year-old Digital Equipment Corp. Alpha servers and other antiquated computer systems were incapable of tracking inventory through a combined in-store and online operation. In fact, throughout the relevant period, the complexities of revenue

31

recognition and inventory management made it wholly impossible for Blockbuster to integrate its in-store Movie Pass subscription business with its online subscription business.

      (b)     The Company was experiencing difficulties launching its "used" DVD trading program, as this business proved very record intensive and placed Blockbuster in a position very similar to pawn-shops regarding the resale of goods by individuals. Because of each state's interest in preventing the resale of stolen goods, Blockbuster was forced to abide by a unique set of compliance rules in every state relating to the record keeping and resale of such goods. These unique compliance issues also placed additional stress on the Company and further hampered the adoption of this business throughout the 9000-store Blockbuster system.

      (c)     Contrary to defendant's statements, the additional debt that was forced upon the Company and the reduction of its cash reserves that resulted from the $5.00 Special Cash Dividend had an adverse impact on the financial condition of the Company. This was especially true in light of defendants' undisclosed plans to engage in a price war with other online DVD retailers and rental services, its plans to end its late fees and its plan to write down $1.5 billion in goodwill and intangible assets, all of which occurred immediately after the Exchange Offer, and all of which placed significant downward pressure on the Company's credit rating and constrained Blockbuster's financial flexibility.

      (d)     The real reason for the Exchange Offer was to allow defendant Viacom to reap hundreds of millions of dollars in proceeds from the Special Dividend and then to use the Exchange Offer to reduce the public float of Viacom, such that Viacom would benefit from the Exchange Offer at the expense of, and with reckless disregard for, Blockbuster.

    71.     Plaintiff and other members of the Class purchased or otherwise acquired Blockbuster common stock relying upon the integrity of the market price of Blockbuster's

32

common stock and market information relating to Blockbuster, and have been damaged thereby, and/or acquired shares of the Company's stock pursuant to Blockbuster's false and materially misleading Prospectus.

72. During the Class Period, defendants materially misled the investing public, thereby inflating the price of Blockbuster's common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were false and materially misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company's financial condition.

73. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by plaintiff and other members of the Class. As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about Blockbuster's financial condition, business prospects and internal operations. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Blockbuster, thus causing the Company's common stock to be overvalued and artificially inflated throughout the Class Period.

74. Defendants' false and materially misleading statements during the Class Period resulted in plaintiff and other members of the Class purchasing the Company's common stock at artificially inflated prices, thus causing the damages complained of herein. In addition, members of the Class also acquired, in the aggregate, at least 144 million shares of Blockbuster stock pursuant to a false and materially misleading Prospectus that accompanied the 2004 Exchange Offer and Splitoff, and have been damaged thereby.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
## FRAUD-ON-THE-MARKET DOCTRINE

75.     At all relevant times, the market for Blockbuster's stock was an efficient market for the following reasons, among others:

(a)     Blockbuster's stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)     As a regulated issuer, Blockbuster filed periodic public reports with the SEC and the NYSE;

(c)     Blockbuster regularly communicated with public investors *via* established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Blockbuster was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

76.     As a result of the foregoing, the market for Blockbuster's stock promptly digested current information regarding Blockbuster from all publicly available sources and reflected such information in Blockbuster's stock price.  Under these circumstances, all purchasers of Blockbuster's common stock during the Class Period suffered similar injury through their purchase of Blockbuster's common stock at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

77.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Blockbuster who knew that those statements were false when made.

## COUNT I

### (Against The Blockbuster Defendants)
### For Violation of Section 11 of the Securities Act

78.     Plaintiff incorporates by reference each and every allegation contained above, as if set forth herein only to the extent, however, that such allegations do not allege fraud, scienter or the intent of defendants to defraud plaintiff or members of the Class.  This count is predicated upon defendants' strict liability for making false and materially misleading statements in the Prospectus.  This Count is asserted by plaintiff against the Blockbuster Defendants by and on behalf of persons who acquired shares of the Company pursuant to the false Prospectus.

79.     Blockbuster is the issuer of the stock issued *via* the false Prospectus.  As such, Blockbuster is strictly liable for each false and misleading statement contained therein.

80.     The Blockbuster Defendants are signatories and/or are responsible for the preparation and filing of the Prospectus, and/or Blockbuster directors and, therefore, each of these defendants had a duty to make a reasonable investigation of the statements contained in the Prospectus to ensure that said statements were true and that there was no omission to state any material fact required to be stated in order to make the statements contained therein not misleading. In the exercise of reasonable care, the Blockbuster Defendants should have known of the material misstatements and omissions contained in the Prospectus and also should have known of the omissions of material fact necessary to make the statements made therein not misleading. As such, each of these defendants are liable to plaintiff and the Class.

81.     Each of the defendants identified in Count I issued, caused to be issued and participated in the issuance of materially false and misleading written statements to the investing public, which were contained in the Prospectus that misrepresented or failed to disclose, *inter alia*, the facts set forth above. By reasons of the conduct alleged herein, each defendant violated, and/or controlled a person who violated Section 11 of the Securities Act. As a direct and proximate result of the Blockbuster Defendants' wrongful conduct, the price for the Blockbuster common stock exchanged in the 2004 Exchange Offer and Splitoff was artificially inflated and plaintiff and the Class suffered substantial damages in connection with their acquisition of Blockbuster common stock.

82.     Plaintiff and other members of the Class acquired their Blockbuster stock without knowledge of the untruths and/or omissions alleged herein. Plaintiff and the other members of the Class were thus damaged by defendants' misconduct and by the material misstatements and omissions of the aforementioned Prospectus.

83. This action was brought within one year after the discovery of the untrue statements and omissions and within 3 years after the Exchange Offering of Blockbuster common stock.

## COUNT II

### Violation of Section 12(a)(2) of the Securities Act
### Against All Defendants

84. Plaintiff repeats and realleges each and every allegation contained above as if set forth herein only to the extent, however, that such allegations do not allege fraud, scienter or the intent of the defendants to defraud plaintiff or members of the Class This Count is asserted against all defendants

85. This Count is brought by plaintiff pursuant to Section 12(a)(2) of the Securities Act on behalf of all those who acquired Blockbuster shares in connection with and traceable to the 2004 Exchange Offer and Splitoff.

86. Defendants were sellers, offerors, and/or solicitors of sales of the Blockbuster shares offered pursuant to the Prospectus.

87. The Prospectus contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and concealed and failed to disclose material facts. Defendants' actions of solicitation included participating in the preparation of the false and misleading Prospectus.

88. The defendants owed to the acquirers of Blockbuster shares that were exchanged in the Exchange Offer the duty to make a reasonable and diligent investigation of the statements contained in the Prospectus, to insure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. These defendants knew of, or in the exercise of reasonable care should

37

have known of, the misstatements and omissions contained in the Offering materials as set forth above.

89.     Plaintiff and other members of the Class purchased or otherwise acquired Blockbuster shares pursuant to and traceable to the defective Prospectus. Plaintiff did not know, or in the exercise of reasonable diligence could not have known, of the untruths and omissions contained in the Prospectus.

90.     Plaintiff, individually and representatively, hereby offers to tender to defendants those securities that plaintiff and other Class members continue to own, on behalf of all members of the Class who continue to own such securities, in return for the consideration paid for those securities together with interest thereon.

91.     By reason of the conduct alleged herein, these defendants violated, and/or controlled a person who violated, Section 12(a)(2) of the Securities Act. Accordingly, plaintiff and members of the Class who acquired Blockbuster shares in the 2004 Exchange Offering have the right to rescind and recover the consideration paid for their Blockbuster shares and, hereby elect to rescind and tender their Blockbuster shares to the defendants sued herein. Plaintiff and Class members who have sold their Blockbuster shares are entitled to rescissory damages.

92.     Less than three years elapsed from the time that the securities upon which this Count is brought were sold to the public to the time of the filing of this action. Less than one year elapsed from the time when plaintiff discovered or reasonably could have discovered the facts upon which this Count is based to the time of the filing of this action.

## COUNT III

**(Against Redstone (As A Control Person Of
National Amusements, Viacom and Blockbuster),
National Amusements (As A Control Person Of Viacom and Blockbuster),
And Viacom, Antioco and Zine (As Control Persons Of Blockbuster))
For Violation of Section 15 of the Securities Act**

93.     Plaintiff incorporates by reference each and every allegation contained above as if set forth herein only to the extent, however, that such allegations do not allege fraud, scienter or the intent of the defendants to defraud plaintiff or members of the Class This Count is asserted against all defendants.

94.     Throughout the Class Period, all defendants acted as controlling persons of Blockbuster within the meaning of Section 15 of the Securities Act. By reason of their stock ownership, senior management positions and/or directorships at the Company, as alleged above, these defendants, individually and acting pursuant to a common plan, had the power to influence and exercised the same to cause Blockbuster to engage in the unlawful acts and conduct complained of herein.

95.     By reason of such conduct, the defendants named in this Count are liable pursuant to Section 15 of the Securities Act. As a direct and proximate result of their wrongful conduct, plaintiffs and the Class suffered damages in connection with their acquisition of Blockbuster common stock.

## COUNT IV

**Violation of Section 10(b) of the Exchange Act and Rule 10b-5
Promulgated Thereunder Against All Defendants**

96.     Plaintiff repeats and realleges each and every paragraph contained above as if set forth herein. This Count is asserted against all defendants.

97.     The defendants named in this Count knew, or were reckless in failing to know, of the material omissions from and misrepresentations contained in the statements as set forth

above. Each of these defendants: (i) knew or had access to the material adverse non- public information about the Company's financial condition; (ii) knew or had access to information that enabled them to know, or to recklessly disregard, that the financial statements provided to investors throughout the Class Period were materially false and misleading; and (iii) knew or recklessly disregarded that, throughout the Class Period, Blockbuster's financial outlook and then-existing business conditions, were not consistent with defendants public disclosures. Moreover, defendants directly or indirectly participated in drafting, reviewing and/or approving the misleading statements, releases, analyst reports and SEC filings and other public representations of and about Blockbuster, including the preparation, authorization and filing of the Company's wholly deficient and defective Prospectus, at all times throughout the Class Period, defendants knew or recklessly disregarded these statements contained therein were false and materially misleading.

98.    Throughout the Class Period, the defendants named in this Count, with knowledge of or reckless disregard for the truth, disseminated or approved releases, statements and reports, referred to above, which were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

99.    During the Class Period, the defendants named in this Count, individually and *via* a fraudulent scheme, directly and indirectly, participated in a course of business that operated as a fraud or deceit on purchasers of Blockbuster stock and concealed material adverse information regarding the Company's true financial and operational condition and business outlook as specified herein. Defendants employed devices, schemes and artifices to defraud and engaged in acts, practices and a course of business as herein alleged to commit a fraud on the integrity of the

market for the Company's stock and to maintain artificially high market prices for the common

stock of Blockbuster. This included the formulation, making of and/or participation in the

making of, untrue statements of material facts and the omission to state material facts necessary

in order to make the statements made, in light of the circumstances under which they were made,

not misleading, and engaging in acts, practices and a course of business that operated as a fraud

and deceit upon plaintiff and the Class, all in connection with the purchase or acquisition of

Blockbuster common stock by plaintiff and members of the Class.

100.    By reason of the conduct alleged herein, the defendants named in this Count

knowingly or recklessly, directly and indirectly, have violated Section 10(b) of the Exchange Act

and Rule 10b-5 promulgated thereunder in that they: (a) employed devices, schemes and

artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts

necessary in order to make statements made, in light of the circumstances under which they were

made, not misleading; and/or (c) engaged in acts, practices and a course of business that operated

as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases

of Blockbuster securities.

101.    Plaintiff and the Class have suffered substantial damages in that, in reliance on the

integrity of the market, they paid artificially inflated prices for Blockbuster common stock as a

result of defendants' violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5.

Plaintiff and the Class would not have purchased or otherwise acquired Blockbuster common

stock at the prices they paid, or at all, if they had been aware that the market prices had been

artificially and falsely inflated by defendants' misleading statements and concealment. At the

time of the purchases or acquisitions by plaintiff and the Class of Blockbuster common stock the

fair and true market value of said common stock was substantially less than the prices paid by them.

## COUNT V

### Against (Against Redstone (As A Control Person Of National Amusements, Viacom and Blockbuster), National Amusements (As A Control Person Of Viacom and Blockbuster), And Viacom, Antioco and Zine (As Control Persons Of Blockbuster) For Violation Of Section 20(a) Of The Exchange Act

102.     Plaintiff repeats and realleges each and every paragraph contained above as if set forth herein.

103.     The defendants named in this count acted as controlling persons of the Company within the meaning of Section 20 of the Exchange Act.  Each controlling person had the power and authority to cause others to engage in the wrongful conduct complained of herein.

104.     By reason of such wrongful conduct, the defendants named in this Count are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of their wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's securities.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff prays for relief and judgment, as follows:

(a)     Determining that this action is a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

(b)     Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.

DATED: November 10, 2005

Respectfully submitted,

*Randall K. Pulliam*

**BARON & BUDD, P.C.**
Randall K. Pulliam (TX # 24048058)
3102 Oak Lawn Ave., Suite 1100
Dallas, TX 75219
(214) 521-3605
(214) 523-1181 (fax)

**MILBERG WEISS BERSHAD**
   **& SCHULMAN LLP**
Steven G. Schulman  *PHV*
Peter E. Seidman   *Unknown*
One Pennsylvania Plaza
New York, NY 10119
(212) 594-5300
(212) 868-1229 (fax)

*--and--*

**MILBERG WEISS BERSHAD**
**& SCHULMAN LLP**
Seth D. Rigrodsky (DSBA No. 3147)  *Not in CM*
919 North Market Street, Suite 411
Wilmington, DE 19801
(302) 984-0597
(302) 984-0870 (fax)

**BULL & LIFSHITZ, LLP**
Peter D. Bull      *Not in CM*
Joshua M. Lifshitz   *Unknown*
18 East 41st Street, 11th Floor
New York, New York 10017
(212) 213-6222
(212) 213-9405 (fax)

**Attorneys for Plaintiff**

43

**LAW OFFICES OF MICHAEL A. SWICK**
Michael A. Swick          NoT /ᴎ Cᴍ
One William Street, Suite 900
New York, NY   10004
Telephone:     (212) 584-0770
Facsimile:     (212) 584-0799

Of Counsel

## CERTIFICATE OF NAMED PLAINTIFF

I, Congregation Ezra Sholom, certify that:

1.  I have reviewed the complaint and authorized its filing or the filing of a Motion for Lead Plaintiff on my behalf by Bull & Lifshitz, LLP.

2.  I did not purchase the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action arising under this title.

3.  I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

4.  My transactions in Blockbuster securities that are the subject of this litigation during the class period set forth in the complaint are as follows:

| Security | Date of Transaction | Amount of Shares Stating Whether Purchased(P) or Sold(S) | Price Per Share |
|----------|---------------------|----------------------------------------------------------|-----------------|
| BBI | 9/14/04 | P-13 | $7.70 |
|  |  |  |  |
|  |  |  |  |

5.  I have not served as or sought to serve as a representative party on behalf of a Class under this title during the last three years.

6.  I will not accept any payment for serving as a representative party, except to receive my pro rata share of any recovery or as ordered or approved by the court including the award to a representative of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

The foregoing are, to the best of my knowledge and belief, true and correct statements.

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

NOV 10 2005

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

ORIGINAL

**I. (a) PLAINTIFFS**
Congregation Ezra Sholom

**DEFENDANTS**
Blockbuster, Inc., et al.

**(b)** County of Residence of First Listed Plaintiff King's County, NY
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant _____
(IN U.S. PLAINTIFF CASES ONLY)

NOTE  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Randall K. Pulliam, Baron & Budd, P.C., 3102 Oak Lawn Avenue, Suite 1100, Dallas, Texas 75219, 214 521-3605

Attorneys (If Known)

**3-05CV2213-N**

**II. BASIS OF JURISDICTION** (Place an "X" in One Box Only)

☐ 1  U.S. Government
Plaintiff

X 3  Federal Question
(U.S. Government Not a Party)

☐ 2  U.S. Government
Defendant

☐ 4  Diversity
(Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only) and One Box for Defendant)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | X 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 900Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | | | ☐ 950 Constitutionality of |
| | Other | | | | State Statutes |
| | ☐ 440 Other Civil Rights | | | | |

**V. ORIGIN** (Place an "X" in One Box Only)

Appeal to District Judge from Magistrate Judgment

X 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

**VI. CAUSE OF ACTION**
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
Securities Exchange Act of 1934 and Securities Act of 1933
Brief description of cause:
Securities fraud class action brought on behalf of those who bought Blockbuster, Inc. stock pursuant to Viacom, Inc. offer

**VII. REQUESTED IN COMPLAINT:**
X CHECK IF THIS IS A CLASS ACTION
UNDER F.R.C.P. 23

DEMAND $ undetermined

CHECK YES only if demanded in complaint:
JURY DEMAND:  X Yes  ☐ No

**VIII. RELATED CASE(S) IF ANY**
(See instructions)

JUDGE _____

DOCKET NUMBER _____

DATE 11/10/05

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____