IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| CONGREGATION OF EZRA SHOLOM, *et al.*, | § § § | |
| Plaintiff, | § § | |
| v. | § § | Civil Action No. 3:05-CV-2213-N |
| BLOCKBUSTER, INC., *et al.*, | § § § | |
| Defendant. | § | |

## <u>ORDER</u>

Before the Court are Defendants Blockbuster, Inc. ("Blockbuster"), John F. Antioco,

Larry Zine, Jackie M. Clegg, Linda Griego, John L. Muething, Viacom, Inc. ("Viacom"),

National Amusements, Inc., Richard J. Bressler, Philippe P. Dauman, Michael D. Fricklas,

and Sumner M. Redstone's motions to dismiss [49 & 50]. Plaintiffs Congregation of Ezra

Sholom, *et al*., also seek leave to file their sur-reply in opposition to Defendants' motions to

dismiss [64]. At bottom, Defendants argue that Class Representative Congregation of Ezra

Sholom has failed to state a cognizable claim under either the Securities Act of 1933, 15

U.S.C. § 77a, *et seq.* ("Securities Act"), or the Securities Exchange Act of 1934, 15 U.S.C.

§ 78a, *et seq.* ("Exchange Act"). Accordingly, Defendants seek dismissal pursuant to Federal

Rule of Civil Procedure 12(b)(6). For reasons explained in greater detail below, the Court

grants Defendants' motions.[1]

---

[1]The Court also denies Plaintiffs' motion for leave to file a surreply [64]. The proposed surreply simply engages in further argument of issues already joined and briefed.

ORDER – PAGE 1

# I. Background

Lead Plaintiffs represent a putative class that purchased Blockbuster shares on the open market between September 8, 2004 and August 9, 2005 (the "Class Period"). Blockbuster, founded in 1985, sells and rents movies and video games in over 8,000 company-owned and franchised stores worldwide and over the Internet through Blockbuster Online. In 1994, Viacom acquired Blockbuster for $8.4 billion. Following an initial public offering in August 16, 1999, Viacom retained 82.3% of the total equity value in, and approximately 95.9% of the total voting power of, Blockbuster.

From 1999 to 2004, the in-home rental and retail movie and game industry rapidly evolved and Blockbuster's hold on the industry began to slip away. Blockbuster faced increased competition from mass market discount retailers, which reflected an industry trend toward DVD sales, rather than rentals. Additionally, alternative sources of home entertainment emerged, including downloadable movies and video on demand services, which offered a wide array of movies from the convenience of one's home. Perhaps most significantly, Internet-based companies, such as Netflix.com, changed the landscape of video rental by providing online libraries and direct home delivery at reduced costs.

On February 10, 2004, Viacom announced it would pursue the divestiture of its 82% interest in Blockbuster through a tax free split-off. In its Exchange Offer Prospectus (the "Prospectus"), Viacom offered to trade Viacom shareholders Blockbuster stock in exchange for up to 27,961,165 shares of Viacom Class A and Class B common stock (the "Exchange Offer"); the Exchange Offer closed on October 5, 2004. A Viacom shareholder electing to

participate in the Exchange Offer would receive 5.15 shares of Blockbuster stock, consisting of 2.575 shares of Blockbuster Class A common stock and 2.575 shares of Blockbuster Class B common stock, for each Viacom share (whether Class A or Class B) tendered. By the terms of the offer, Viacom shareholders would receive a 17.6 to 19.2% premium over then-current market prices. On June 18, 2004, Blockbuster announced that it would pay a special cash dividend of $5.00 per share of common stock, payable September 3, 2004, to shareholders of record at the close of business on August 27, 2004.[2] Viacom received $738 million in proceeds as a result of the special dividend.

From February 10, 2004 to August 9, 2005, Blockbuster issued a number of statements touting the Exchange Offer. Around the time of the Exchange Offer, Blockbuster issued a press release explaining the motive for the split-off: "we believe that by becoming a separate company we will be better able to pursue our retailing strategy. Additionally, we believe issuing a special cash distribution will offer value to our stockholders without inhibiting us from executing our plan." Complaint ¶ 37. Other statements, appearing in the Prospectus, for example, discussed Blockbuster's business initiatives, the adequacy of cash flow, and Blockbuster's optimism for the future.

On October 27, 2004, Blockbuster issued a Fourth Quarter and Full Year 2004 Business Outlook in which it announced its expectation that profitability would be down for

---

[2]"Blockbuster also stated that it received a financing commitment from JPMorgan, Citigroup and Credit Suisse First Boston for a new $1.45 billion credit facility that would be used to finance the special distribution and replace Blockbuster's current revolving credit facility." Second Amended Complaint ¶ 37 ("Complaint") (internal quotations omitted).

ORDER – PAGE 3

4Q:04.  The release explained that continued weakness in the rental industry, investments in various initiatives, and higher interest expense of the debt incurred to pay the special dividend would result in the significant decline in profitability.  Blockbuster further explained that it intended to invest heavily in the business in 2005, which, combined with lagging rental industry, would adversely affect profitability for 2005 as well.  Still, Blockbuster assured shareholders that it "believed" it was "taking the right steps to position Blockbuster for future growth in both revenues and profits."  Complaint ¶ 73.

On December 14, 2004, Blockbuster unveiled a new "No Late Fee" initiative. Pursuant to this initiative, Blockbuster would stop charging customers a fee for keeping in-store rentals past their due dates.  Instead, customers were given a one-week grace period within which to return the movie, and after which Blockbuster would automatically sell the customer the product, less the rental fee.  If the customer returned the movie within thirty days, Blockbuster would credit the account with the amount, less a $1.25 restocking fee.  In the press release announcing the initiative, Blockbuster explained that it had been testing a variety of rental options in markets across the country and had conducted exhaustive consumer research.  According to Blockbuster, research indicated that in test markets, the "No Late Fee" initiative "increased rental transactions and retail sales [that] offset the lower level of revenues resulting from eliminating fees."  Complaint ¶ 79.  Blockbuster concluded that the initiative would "be a key to growth in the future," and would "enable [it] to revitalize [its] core rental business."  Complaint ¶ 80.

On March 29, 2005, Blockbuster filed its Form 10-K (the "10-K") for the fiscal year ending December 31, 2004, in which Blockbuster provided further financial overview. Blockbuster noted that during 2004 it successfully launched Blockbuster Online and that it believed that the various initiatives would provide growth opportunities and complement the continually declining rental business. Also, the 10-K reiterated Blockbuster's belief that it would "compete effectively as an independent company and that separation from Viacom ha[d] better positioned [Blockbuster] to pursue [its] unique corporate goals and growth opportunities . . . ." Complaint ¶ 90. The 10-K further reiterated Blockbuster's expectation to have adequate cash flow to pursue the proposed initiatives.[3]

Finally, on August 9, 2005, Blockbuster made an announcement that Plaintiffs allege revealed facts about Blockbuster's financial health that had previously been actively concealed (the "August 9 Announcement"). That day, Blockbuster reported a net loss of $57.2 million, or $0.31 per share, for the second quarter of 2005. Moreover, Blockbuster reported a 5.2% decline in total rental revenues and a decrease in gross profits, rental gross profits, and rental gross margins of 11.5%, 10.0%, and 600 basis points, respectively, during 2Q:05. Blockbuster attributed these declines to lower gross margins from Blockbuster Online and the combination of decreasing revenues per transaction and increasing product

---

[3]On April 18, 2005, Antioco issued a letter to Carl Icahn, one of Blockbuster's largest individual investors, responding to a letter initially sent by Icahn in which he accused Antioco of conducting a "spending spree." In the response to Icahn, Antioco conveyed Blockbuster's belief that the initiatives were working and that abandoning the strategy would be shortsighted and would result in a precipitous drop in future cash flow, from which there would be no recovery. Complaint ¶ 93. Plaintiffs contend the statements in Antioco's response were materially false. *Id.*

purchases resulting from "No Late Fees" and subscription-based memberships. Furthermore, Blockbuster withdrew its full-year forecast and stated that it had negotiated with lenders to prevent a high debt ratio from triggering default on a line of credit.

Following the August 9 Announcement, the price of Blockbuster stock dropped. On the day of the announcement Blockbuster Class A common stock fell $0.92, or 11%, from $8.01 to $7.09 per share, on a trading volume of 14,171,000. Similarly, Blockbuster Class B common stock fell $0.99, or 13%, from $7.60 to $6.61. The trend continued the following day, resulting in around a 16% loss of value for each Class over a two day period. Plaintiffs filed suit on November 11, 2005, alleging violations of sections 11 and 12(a)(2) of the Securities Act, sections 10(b) and 20(a) of the Exchange Act, and Rule 10b-5 promulgated under the Exchange Act by the SEC.

At bottom, Plaintiffs argue that Defendants engaged in materially fraudulent conduct that caused Plaintiffs to purchase Blockbuster shares from September 8, 2004 to August 9, 2005 at artificially inflated prices, which ultimately led to a significant loss when the fraudulent conduct was revealed and the price of the shares dropped. Specifically, Plaintiffs argue that Defendants did not disclose the true state of Blockbuster's cash flow position at any time, including in the Prospectus. Plaintiffs contend that Blockbuster was aware but did not disclose that an internal cash flow analysis showed that after paying the special dividend, Blockbuster would lack sufficient cash to pursue the initiatives described in the Prospectus. Therefore, the statements presented investors with a falsely positive outlook on the Exchange Offer and on Blockbuster's financial position. Plaintiffs argue that such misstatements and

omissions were prevalent throughout the class period and were knowingly or recklessly made.  According to Plaintiffs, the falsity of Defendants' statements (or omissions) was revealed to the market by the August 9 Announcement.

Plaintiffs further argue that Defendants made materially false statements (or omitted material facts) in relation to the "No Late Fees" initiative.  Plaintiffs contend that Blockbuster understated the research and the markets in which the "No Late Fees" initiative was tested.  According to Plaintiffs, Blockbuster was understocked with product in the test markets and compensated by borrowing inventory from surrounding areas in order to make up for the gap in inventory that occurred as a result of customers' extended retention of the product.  This, together with the decrease in revenue generated from late fees and lack of appreciable increase in memberships, according to the Plaintiffs, was a clear indicator of the program's failure.  Blockbuster nonetheless continued publicly, and optimistically, to tout the initiative.  Furthermore, Plaintiffs contend that Chief Executive Officer Atioco was presented with financial models showing that the initiative would lose money, but refused to acknowledge that it would yield negative results.  Because Antioco nonetheless conveyed optimism in the "No Late Fees" initiative, Plaintiffs contend that Blockbuster disseminated false and misleading information that touted the company's capability to implement the initiative as well as its anticipated success.

Finally, Plaintiffs allege that certain post-Class Period events are relevant to this case.  On March 9, 2006, Blockbuster announced that, due to an accounting misclassification, it would reclassify cash flows relating to the purchase of videos for its rental library contained

ORDER – PAGE 7

in its financial statements dating back to 2003. Blockbuster had previously classified the purchases as an investing cash outflow and rental library assets as a noncurrent asset. However, as a result of discussions with the SEC, "the Company . . . determined that rental library purchases should be classified as an operating cash outflow . . . and that rental library assets should be classified as a current asset . . . ." Complaint ¶ 103. Plaintiffs argue that the restatement made clear that many of Blockbuster's financial problems, which allegedly were revealed in the August 9 Announcement, existed during the Class Period but were masked by Blockbuster's improper accounting.

Defendants argue that Plaintiffs' claims must be dismissed. First, Defendants contend that Plaintiffs' sections 11 and 12(a)(2) claims must be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(1) because Plaintiffs lack standing to sue. Next, Defendants contend that Plaintiffs' Exchange Act claims must be dismissed pursuant to Rule 12(b)(6) because, among other things, Defendants' statements are protected under the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. 78u, *et seq.*, and because Plaintiffs failed to allege loss causation as required by the PSLRA and the Supreme Court in *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336 (2005). For reasons explained below, the Court grants Defendants' motions to dismiss.

## II. LEGAL STANDARDS

Under Rule 12(b)(1), the court may dismiss a case for "lack of jurisdiction over the subject matter." FED. R. CIV. P. 12(b)(1). Whenever it appears by suggestion of the parties

or otherwise that a court lacks jurisdiction over an action's subject matter, the court must dismiss the action.  FED. R. CIV. P. 12(h)(3).

Under Rule 12(b)(6), the court may dismiss a case for "failure to state a claim upon which relief can be granted."  FED. R. CIV. P. 12(b)(6).  To survive a motion to dismiss, a complaint must include some factual allegations to support the elements of the asserted claim.  As the Supreme Court recently explained, "a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations."  However, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do . . . ." *Bell Atlantic Corp. v. Twombly*, – U.S. –, 127 S.Ct. 1955, 1964-65 (2007).  Therefore, a complaint must include "enough [factual allegations] to raise a right to relief above the speculative level . . . ." *Id.* at 1965.  If the complaint is lacking, dismissal is appropriate.  *See Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000); *Blackburn v. City of Marshall*, 42 F.3d 925, 931 (5th Cir. 1995) ("[d]ismissal is proper if the complaint lacks an allegation regarding a required element necessary to obtain relief.") (quoting 2A MOORE'S FEDERAL PRACTICE ¶ 12.07 [2.-5], at 12-91 (footnote omitted)).  "In ruling on a motion to dismiss in a securities fraud . . . action, the court may consider (1) documents attached . . . or incorporated into [the complaint], (2) the contents of relevant public disclosure documents required to be filed and actually filed with the SEC, or (3) documents referenced in the complaint."  *In re Alamosa Holdings, Inc.*, 382 F. Supp. 2d 832, 840-41 (N.D. Tex. 2005) (citing *Lovelace v. Software Spectrum*, 78 F.3d 1015, 1017-18 (5th Cir.1996)).

ORDER – PAGE 9

Because Plaintiffs assert fraud claims under the Exchange Act Rule 10(b), they must also satisfy heightened pleading requirements imposed by Federal Rule of Civil Procedure 9(b) and the PSLRA to avoid dismissal.  *ABC Arbitrage Plaintiffs Group v. Tchuruk*, 291 F.3d 336, 349-50 (5th Cir. 2002).  Rule 9(b) requires certain minimum allegations to be pled in securities fraud cases including the specific place, time, and content of the false representations as well as the identity of the individual making the false representations and what the person gained from making the representations.  *Shushany v. Allwaste, Inc.*, 992 F.2d 517, 521 (5th Cir. 1993).  Additionally, the PSLRA requires complaints in security fraud cases "to specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. §§ 78u-4(b)(1) (1995).  For particularity purposes, a plaintiff must specify the who, what, when, where, and how of their alleged securities fraud. *ABC Arbitrage Plaintiffs Group*, 291 F.3d at 349-50.

### III. PLAINTIFFS LACK STANDING TO BRING A CLAIM UNDER THE SECURITIES ACT

Defendants first argue that Plaintiffs lack standing to sue under sections 11 and 12(a)(2) of the Securities Act.  Specifically, Defendants contend that Plaintiffs fail to allege that they acquired shares either directly in or traceable to the Exchange Offering and Prospectus.

Section 11 creates liability for the issuance of registration statements containing false material facts or omissions of fact, and provides that "any person acquiring [a] security"

ORDER – PAGE 10

issued pursuant to such a statement may sue. 15 U.S.C. § 77k(a). As the Fifth Circuit explained, because "[s]ection 11's liability provisions are expansive," its standing provision is "narrow." *Krim v. PcOrder.com, Inc.*, 402 F.3d 489, 495 (5th Cir. 2005). Section 11's liability provisions create "'virtually absolute' liability for corporate issuers for even innocent material statements . . . ." *Id.* at 495. Therefore, before a plaintiff may "take advantage of the lower burden of proof and almost strict liability available under § 11, [he or she] must meet higher procedural standards." *Id.* at 496 (quoting *Harden v. Raffensperger, Hughes & Co.*, 933 F.Supp. 763, 766 (S.D. Ind. 1996)). That is, a party must show that it (1) bought directly from the issuer or underwriter in the initial offering, or (2) made an aftermarket purchase and can "'trace' their shares to the faulty registration" at issue. *Id.* at 495-96.

Similar to section 11, section 12(a)(2) creates liability for "any person who offers or sells a security . . . by the use of any . . . instrument . . . which includes" false material facts or omissions of fact. 15 U.S.C. § 77l(a). Unlike section 11, however, section 12(a)(2) limits standing to "the person purchasing from" the seller. *Id.* In other words, section 12(a)(2) standing is more narrow than section 11 standing in that it is limited to shareholders who acquired securities directly in the initial offering; it is not sufficient to allege that the shares can be "traced back" to the offering. Defendants contend that Plaintiffs lack standing under both sections.

Rather than deny that they lack standing, Plaintiffs argue that their case is properly before the Court because "Plaintiffs' Securities Act and Exchange Act claims arise largely

ORDER – PAGE 11

from the same course of conduct, involve overlapping groups of defendants, and derive from many of the same factual allegations."  Response at 7 n.4.[4]  In other words, Plaintiffs contend that, even though they lack standing under sections 11 and 12(a)(2), the Court should allow the Securities Act claims to proceed because they have standing to pursue their Exchange Act claims and because Plaintiffs will adequately represent the class's interest.  Unfortunately, Plaintiffs misunderstand the doctrine of standing.

Standing is an "aspect of justiciability"[5] that asks "whether the person whose standing is challenged is a proper party to request an adjudication of a particular issue."  *Flast v. Cohen*, 392 U.S. 83, 99-100 (1968).  If a party lacks standing, a court lacks the authority to render a judgment.  U.S. CONST. art. III, § 2, cl. 1.  While the Class may well include unnamed class members who have standing to pursue claims under sections 11 and 12(a)(2), none of those putative class members is a named plaintiff.  Plaintiffs therefore lack standing to assert a section 11 and 12(a)(2) claim; "a plaintiff who lacks standing to sue a defendant may not acquire such status through class representation."  *Matte v. Sunshine Mobile Homes,*

---

[4]Plaintiffs make this argument with regard to section 11.  Plaintiffs fail to discuss standing at all with regard to section 12(a)(2).  The Court will assume that Plaintiffs' argument applies equally to standing under section 12.

[5]"Justiciability is the term of art employed to give expression to [the] dual limitation placed upon federal courts by the case-and-controversy doctrine."  *Flast v. Cohen*, 392 U.S. 83, 95 (1968).  That dual limitations are: (1) the limit on the federal courts' "business" to "questions presented in an adversary context and in a form historically viewed as capable of resolution through the judicial process" and (2) the judiciary's limited role "in a tripartite allocation of power to assure that the federal courts will not intrude into areas committed to the other branches of government."  *Id.* at 94-95.

*Inc.*, 270 F. Supp. 2d 805, 826 (W.D. La. 2003) (citing *Weiner v. Bank of King of Prussia*, 358 F. Supp. 684, 694 (E.D. Pa. 1973)).

Alternatively, Plaintiffs request that the Court allow them to disseminate a notice to the members of the putative class so that they can ameliorate any standing deficiency. Plaintiffs' request is too late. This case was filed over 19 months ago, on November 10, 2005, affording Plaintiffs ample time and opportunity to cure any anticipated procedural defect. Moreover, a motion to dismiss is a dispositive motion for the benefit of the defendant, not a trial run for the plaintiff that provides an opportunity to submit an argument followed by subsequent curative responses depending on the relative strengths or weaknesses of his or her case. Accordingly, the Court denies Plaintiffs' request and dismisses Plaintiffs' section 11 and 12(a)(2) Securities Act claims for lack of standing.

### IV. PLAINTIFFS FAIL TO STATE A CLAIM UNDER THE EXCHANGE ACT

Next, Defendants argue that Plaintiffs fail to state a claim under section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) ("section 10(b)"). Section 10(b) prohibits the "use or employ, in connection with the purchase or sale of any security . . . , [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors." *Id.* SEC Rule 10b-5 implements section 10(b) by declaring it unlawful:

(a) To employ any device, scheme, or artifice to defraud,
(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

To establish section 10(b) liability in a private right of action – and, therefore, survive a motion to dismiss – the PSLRA requires that a private plaintiff must meet certain minimum pleading requirements. That is, a plaintiff must plead (1) a material misrepresentation or omission, (2) made with scienter, (3) in connection with the purchase or sale of a security, (4) upon which the plaintiffs relied, (5) proximately resulting in an economic loss, i.e., "loss causation." *Dura*, 544 U.S. 336, 341-42. The PSLRA also provides a "safe harbor" from liability for a forward looking statement when it is (1) "identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially," or (2) "immaterial." 15 U.S.C. § 78u-5(c)(1). The PSLRA safe harbor also applies where a plaintiff fails to allege that the statement was made with "actual knowledge" that it was "false or misleading." 15 U.S.C. § 78u-5(c). However, if the alleged misrepresentation or omission is deemed immaterial or if it "qualifies as 'forward-looking' and is accompanied by sufficient cautionary language, a defendant's statement is protected regardless of the actual state of mind."[6] *Miller v.*

---

[6]In addition to the protections above, the PSLRA safe harbor applies where a plaintiff fails to prove that the statement was made with "actual knowledge" that it was "false or misleading." 15 U.S.C. § 78u-5(c). The statute is worded disjunctively – that is, the safe harbor applies if the forward looking is accompanied by meaningful cautionary language, *or* if a plaintiff fails to prove that it was made with "actual knowledge" that it was false or misleading. Therefore, courts have held that if a forward looking statement is accompanied by meaningful cautionary language, the "state of mind is irrelevant." *Blockbuster*, 2004 WL

*Champion Enters., Inc.*, 346 F.3d 660, 672 (6th Cir. 2003); *see also Southland Sec. Corp. v. INSpire Ins. Solutions*, 365 F.3d 353, 371-72 (5th Cir. 2004).

Defendants argue that Plaintiffs' claims must be dismissed because (1) the allegedly fraudulent statements either were immaterial, or forward looking and protected by the PSLRA's safe harbor, or not sufficiently alleged to be made with scienter, and, in the alternative, (2) because the complaint failed to allege loss causation adequately. The Court agrees.

### A. Many of the Alleged Misstatements Fall Within the PSLRA Safe Harbor's Reach

Defendants first contend that several of the alleged misrepresentations contained in Plaintiffs' second amended complaint are immaterial and therefore must be dismissed pursuant to Rule 12(b)(6). Because the statute does not define "material," courts have turned to the common law for guidance. In *Basic Inc. v. Levison*, 485 U.S. 224, 231-32 (1988), the Supreme Court expressly adopted for the section 10(b) and Rule 10b-5 context the materiality standard previously established for the proxy-solicitation context in *TSC Indus., Inc. v Northway, Inc.*, 426 U.S. 438 (1976). *Basic*, 485 U.S. at 331-32. In other words, "to fulfill the materiality requirement [in the section 10(b) and Rule 10b-5 context,] there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Id.* Puffery or vague, optimistic statements that contain little to no concrete facts

---

884308, at *2; *see also In re XM Satellite Radio Holdings Securities Litigation*, 479 F. Supp. 2d 165, 186 n.14 (D.D.C. 2007).

are generally considered immaterial. *See Southland*, 365 F.3d at 372; *see also Kurtzman v. Compaq Computer Corp.*, 2002 WL 32442832, at *21 (S.D. Tex. March 30, 2002) ("Courts have found statements immaterial as a matter of law, and therefore not actionable, where they are vague or general statements of optimism or about a company's progress and thus cannot be the basis for a fraud claim.") (citing cases).

Here, several statements contained in Plaintiffs' second amended complaint were nothing more than "generalized positive statements about the company's competitive strengths, experienced management, and future prospects." *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 869 (5th Cir. 2003); *see* Complaint ¶¶ 46, 47, 52, 66, 73, and 96. As the Fifth Circuit has made clear, Blockbuster "was under no duty to cast its business in a pejorative, rather than a positive, light." *Id.* The statements in paragraphs 46, 47, 52, 66, 73, and 96 of Plaintiffs' second amended complaint are vague, optimistic statements touting the company's competitive strengths and future prospects. The statements did not contain historical facts, nor did they discuss specific goals or benchmarks for the future. "'Because analysts rely on facts in determining the value of a security,' these statements 'are certainly not specific enough to perpetrate a fraud on the market.'" *Southland*, 365 F.3d at 372 (quoting *Raab v. Gen. Physics Corp.*, 4 F.3d 286, 290 (4th Cir. 1993)). Accordingly, the Court dismisses Plaintiffs' claims with regard to the statements referenced in paragraphs 46, 47, 52, 66, 73, and 96 of Plaintiffs' second amended complaint.

Forward looking statements accompanied by "meaningful cautionary" language are also, in effect, immaterial and therefore not actionable. A "forward looking statement" is

ORDER – PAGE 16

>   (A) a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items;
>   (B) a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer;
>   (C) a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission;

15 U.S.C. § 78u-5(i)(1). As with the term "material," the statute fails to define what constitutes a "meaningful cautionary statement." In *Southland*, the Fifth Circuit explained that "[t]he requirement for 'meaningful' cautions calls for 'substantive' company-specific warnings based on a realistic description of the risks applicable to the particular circumstances, not merely a boilerplate litany of generally applicable risk factors." *Southland*, 365 F.3d at 372. In *Harris v. Ivax Corp.*, the Eleventh Circuit examined the phrase and concluded that "meaningful" cautionary language is language that identifies "important factors that could cause actual results to differ materially" from the forward looking statements. *Harris v. Ivax Corp.*, 182 F.3d 799, 807 (11th Cir. 1999) (quoting 15 U.S.C. § 78u-5(c)(1)). In other words, cautionary language must advise an investor "of risks of a significance similar to that actually realized" in order to put the investor "on notice of the danger of the investment," *id.* at 807, but "need not list the specific risk factor alleged to have rendered the forward-looking statement false." *In re Blockbuster Inc., Sec. Litig.*, 2004 WL 884308, at *5 (N.D. Tex. April 26, 2004) (citing *Harris v. Ivax Corp.*, 182 F.3d 799, 807 (11th Cir. 1999)). Under this standard, a court must analyze the statements individually and

in context in order to determine if a plaintiff has properly pled his claim.  *See Lain v. Evans*, 123 F. Supp. 2d 344, 348 (N.D. Tex. 2000) ("The PSLRA does not permit the Court to look at the broad picture to determine if Plaintiff has properly plead its claim.").

Because of the large number of statements contained in Plaintiffs' complaint, it is helpful to identify the statements that Plaintiffs allege violate the Exchange Act and place them into groups based on the date of occurrence and the alleged misrepresentation.  Group 1 consists of paragraphs 48-51, which contain statements that appear in the Prospectus. Plaintiffs contend these statements were misleading insofar as they conditioned investors to believe that Blockbuster was in a position to experience growth and that it possessed the necessary cash flow to do so.  Group 2 consists of paragraphs 66-68, which include statements made in an interview that appeared in the National Post's "Financial Post & FP Investing" and during a conference call held on October 27, 2004.  Here, Plaintiffs argue that Blockbuster made misleading statements about its financial flexibility to support its purported growth strategy.  *See* Complaint ¶ 69.  Group 3 includes statements referenced in paragraphs 75 and 76 – an interview and Blockbuster's Form 10-Q for 3Q:04 respectively – which Plaintiffs argue hid the extent of the cash flow dilemma Blockbuster was experiencing.  Group 4 includes statements made during the unveiling of Blockbuster's "No Late Fees" initiative, and are referenced in paragraphs 79, 80, 82, and 89.  Group 4 also includes a letter written to Blockbuster's largest individual investor, Carl Icahn, referenced in paragraph 93 of Plaintiffs' second amended complaint, as well as Blockbuster's Form 10-K for the fiscal year ended December 31, 2004, referenced in paragraph 90.  Finally, Group

4 includes statements made in a press release issued on May 5, 2005 – paragraph 95. Plaintiffs argue that these statements misled investors regarding the success and potential success of the initiative. The Court will discuss the applicability of the safe harbor with regard to each group in turn.

Group 1 consists of statements that make clear they are forward-looking and urge caution upon the reader. First, with regard to the forward-looking statements, the prospectus is replete with anticipatory and forward-looking statements, marked by words such as "anticipate," "expect," "believe," "likely," etc. For example, the Prospectus states that "each company *believes* that the separation of Blockbuster from Viacom . . . *will* strengthen its ability to focus its managerial and financial resources on developing and growing its core businesses . . ." and that "[t]he split-off is *intended* to establish Blockbuster as an independent entity." Complaint ¶¶ 48 & 49. Such language makes clear to the reader that these statements were forward-looking. Next, the forward looking statements contained in the Prospectus are accompanied by "'substantive' company-specific warnings based on a realistic description of the risks applicable to the particular circumstances, not merely a boilerplate litany of generally applicable risk factors." *Southland*, 365 F.3d at 372. For example, Blockbuster cautioned that the proposed investments "will adversely affect its profitability," Ex. 1, App. 73, and that "Blockbuster has had limited experience with certain new customer proposition initiatives and cannot assure you when or if these future initiatives will have a positive impact on Blockbuster's profitability," Ex. 1, App. 79. Furthermore, Blockbuster warned that it would "no longer have access to the financial strength and

resources of Viacom," Ex. 1, App. 91, and that the initiatives, and the initial investments associated with them, would "adversely impact[]" Blockbuster's cash flow, Ex. 1, App. 73. Together, the language both makes clear that the statements are forward looking and cautions readers about specific risks.

Finally, although not determinative alone, the Prospectus warned that the accompanying documents, and statements therein, contained both historical and forward looking statements. With regard to forward-looking statements, the warning explained that "forward-looking statements are not guarantees of future performance and involve unknown risks [and] uncertainties . . . that may cause Viacom's or Blockbuster's actual results . . . to vary materially from what is expressed in or indicated by such forward-looking statements." Ex. 1, App. 100. Although this warning alone fails to pull every statement contained in the Prospectus within the protection of the safe harbor, it certainly cautions shareholders, and potential shareholders, that some relatively speculative statements exist. This, coupled with the discussion above about the statements themselves, brings Group 1 within the safe harbor's protection.

Group 2 contains fewer substantive statements, most of which are protected. First, the statements appearing in paragraphs 67 and 68 accompany forward-looking, cautionary language. Prior to the conference call during which these alleged statements were made, Blockbuster warned that the statements made during the call were "not guarantees of future performance and involve risks, uncertainties, assumptions and other factors that could cause actual results to vary materially from these expressed in or indicated by the forward-looking

ORDER – PAGE 20

statements." Ex. 3, App. 389.  More specifically, Antioco tempered the statements he made with forward-looking language and warned that Blockbuster was "not expecting a [sic] make a profit this year or next as a result of the investment we are making in the service . . . ." Complaint ¶ 67.  Accordingly, the statements in paragraphs 67 and 68 are covered by the safe harbor.  While the statement in paragraph 66 does not appear to accompany forward-looking, cautionary language, as discussed above, it is not material and is therefore not actionable.

Group 3 also falls within the protection of the safe-harbor.  The statements in Group 3 contain forward-looking language such as "We *think* these initiatives are very good" and "We *expect* cash on hand . . . to be sufficient."  Complaint ¶¶ 75 &76.  Moreover, Blockbuster coupled the forward looking statements with meaningful cautionary language.  The statement contained in paragraph 75 of Plaintiffs' complaint explicitly states that the initiatives "require investment upfront and that affects the value of the company right now." The Form 10-Q contained the same cautionary language as the prospectus discussed above. Specifically, the Form 10-Q warned that "Blockbuster must dedicate a substantial portion of its cash flows from operations to the payment of its indebtedness" which leaves Blockbuster "more vulnerable to adverse economic and industry conditions."  Ex. 1, App. 85-87 (same cautionary language used in Prospectus).  This language put readers on notice of specific risks and, accordingly, falls within the protection of the safe harbor.

Finally, Group 4 contains a number of statements that fall within the safe harbor's protection as well as some that do not.  First, many of the statements in this group are nearly identical to those discussed above and therefore need no further discussion – they are

forward-looking statements accompanied by meaningful cautionary language. Others, such as those appearing in paragraphs 79, 80, 93, and 95 are not forward-looking; they discuss historical facts. For example, in paragraphs 79 and 80 Antioco states that Blockbuster had been testing the "No Late Fees" initiative and proceeds to discuss the results. He stated, "[i]n our 'no late fees' test markets, the increased rental transactions and retail sales offset the lower level of revenues resulting from eliminating late fees." Complaint ¶ 79. He also stated, "over time we had more customers spending more with us more often than the markets where we still had late fees." *Id.* at ¶ 80. Such statements are historical facts that arguably "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic*, 485 U.S. at 331-32. Accordingly, they do not fit within the safe harbor's reach. However, as will be explained below, Plaintiffs fail to allege adequately that Defendants made these claims with the requisite scienter.

### B. Plaintiffs Fail to Allege Scienter Adequately

To state a claim under the PSLRA, plaintiffs must, among other things, "plead with particularity facts giving rise to a strong inference that defendants acted with scienter, which is 'a mental state embracing intent to deceive, manipulate, or defraud.'" *Barrie v. Intervoice-Brite, Inc.*, 397 F.3d 249, 263 (5th Cir. 2005) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976)); *see also* 15 U.S.C. § 78u-4(b)(2). Defendants contend that Plaintiffs fail to allege scienter as necessary to recover for statements appearing in paragraphs 79, 80, 93, and 95 of Plaintiffs' second amended complaint.

Plaintiffs first attempt to show scienter by claiming that Antioco and Zine made unusually large stock sales while prices were inflated due to the false representations, giving rise to a strong inference of scienter arising out of their profit motive. But a substantial portion of those sales were pursuant to a prearranged sale plan for tax purposes, and thus do not support a strong inference of scienter. *See In re Lab. Corp. of Am. Holdings Sec. Litig.*, 2006 WL 1367428, at *11 n.10 (M.D.N.C. May 18, 2006) ("Moreover, Plaintiffs allegations regarding stock sales pursuant to pre-existing Rule 10b5-1 plans and the purchase of Dynacare where a relatively small component of the transaction is in stock, do not add to the scienter analysis in any meaningful way."); *see also Cent. Laborers' Pension Fund v, Integrated Elec. Servs. Inc.*, — F.3d — , slip op. at 10-11 & n.4 (5th Cir. Aug. 21, 2007) (noting argument, though finding it factually inapplicable). The balance of the stock sales (17.8% of Antioco's holdings and 12.4% of Zine's) are simply not a large enough share of Antioco and Zine's holdings to support a strong inference that they deliberately lied about Blockbuster's condition so they could make a profit selling a small portion of their holdings. *See, e.g.*, *In re Petsmart, Inc. Sec. Litig.*, 61 F. Supp. 2d 982, 1000 (D. Ariz. 1999) ("where an individual retains significantly more shares than he or she sold, the resulting aggregate loss may defeat an inference of fraud"); *In re Sec. Litig. BMC Software, Inc.*, 183 F. Supp. 2d 860, 901-02 (S.D. Tex. 2001) (sale of 22% of holdings insufficient).

Plaintiffs also attempt to plead scienter by showing that Defendants allegedly knew of the falsity of their statements. Plaintiffs rely on several confidential former employees (the "Confidential Sources"). According to the Confidential Sources, Defendants Antioco

and Zine were presented with financial models showing that the "No Late Fees" initiative would lose money, which Antioco refused to acknowledge.[7]  What is missing from the Complaint, however, is any indication that Antioco or Zine accepted the models and proceeded nonetheless.  To the contrary, the Confidential Source indicated that Antioco rejected the assumptions underlying the models.  This is more consistent with an inference that Antioco and Zine disagreed with the pessimistic models, and that is why they went forward with the "No Late Fees" initiative.  It is illogical and contrary to common sense to infer that two executives would believe that a new program would be disastrous, and nonetheless proceed.  As the Supreme Court recently stated: "A complaint will survive, we hold, only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2510 (2007); *accord Cent. Laborers'*, slip op. at 5-6.  Because the inference that Plaintiffs urge (Antioco and Zine agreed with the models and proceeded anyway) is less likely than the opposite inference (Antioco and Zine disagreed with the assumptions underlying the models, and that is why they proceeded

---

[7]Additionally, another Confidential Source explained that Blockbuster did not test for, or understand, the impact of "No Late Fees" when rolled out onto the national market.  This source continued to explain that customers kept the video for 20-30 days, resulting in a cash crunch and less turnover in the inventory.  The failure to understand the impact of a new program hardly gives rise to a strong inference of scienter.

ORDER – PAGE 24

notwithstanding the models), Plaintiffs fail to plead facts supporting a strong inference of scienter.[8]

### C.  Plaintiffs Failed to Allege Loss Causation Adequately

In addition to the defects with Plaintiffs' Exchange Act claims discussed above, the Court holds in the alternative that Plaintiffs fail to allege loss causation adequately.  To succeed in a section 10(b) claim under the PSLRA, a plaintiff must prove loss causation, i.e., the "causal connection between the material misrepresentation and the loss." *Dura*, 544 U.S. at 342.  Because a plaintiff must prove loss causation under the PSLRA, "the general rules of pleading require that the plaintiff also plead it in his complaint." *Teachers' Retirement System of LA v. Hunter*, 477 F.3d 162, 185 (4th Cir. 2007) (citing *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 346 (2005) ("our holding about plaintiffs' need to prove proximate causation in economic loss leads us also to conclude that the plaintiffs' complaint here failed adequately to allege these requirements")).  Defendants contend that Plaintiffs have failed to plead a corrective disclosure revealing the truth of the alleged misrepresentations or omissions and, thus, have failed to properly allege loss causation.

In their second amended complaint, Plaintiffs allege that "materially false and misleading statements . . . made during the Class Period . . . artificially inflated prices.  When the true facts that defendants had been concealing finally came to light, Plaintiffs . . . suffered damages as a result of the corresponding drop in the price of their shares that occurred."

---

[8]Plaintiffs also argue summarily that Antioco and Zine's signing Sarbanes-Oxley certifications shows scienter.  That bare allegation is now foreclosed in the Fifth Circuit. *See Cent. Laborers'*, slip op. at 11-12.

Complaint ¶ 120. The "coming to light" to which Plaintiffs refer is the August 9 Announcement in which Blockbuster reported a net loss of $57.2 million for the second quarter of 2005, as well as a decline in total rental revenues, gross profits, rental gross profits, and rental gross margins. Blockbuster attributed these declines to lower gross margins from Blockbuster Online and the combination of decreasing revenues per transaction and increasing product purchases resulting from "No Late Fees" and subscription-based memberships. Following the August 9 Announcement the price of Blockbuster Stock dropped, resulting in around a 16% loss of value for each Class over a two day period. Plaintiffs contend that the August 9 Announcement "constitutes an admission" that the initiatives were not working and reveals the truth about Blockbuster's financial health, which Plaintiffs allege Defendants actively concealed.[9]

Plaintiffs overstate the extent of disclosures made in the August 9 Announcement. First, the August 9 Announcement did not explicitly correct a prior misrepresentation or provide previously undisclosed material facts or risks that proximately caused the loss for which Plaintiffs seek damages. In fact, the August 9 Announcement did not even reveal that the initiatives were not working. The August 9 Announcement simply announced disappointing earnings, and withdrew its full-year forecast – an unfortunate, but relatively common occurrence. To avoid dismissal on these facts, Plaintiffs must take the position that

---

[9]Plaintiffs also allege that certain post-Class Period activity proves that Blockbuster's statements were materially false. *See supra* page 8. However, Plaintiffs cannot possibly connect the alleged loss to events occurring seven months after the close of the Class. Accordingly, the post-class period activity is not material.

ORDER – PAGE 26

a disclosure of lower than expected earnings constitutes a disclosure that prior positive statements about the company and its financial health were false. Without more, Plaintiffs fall short of alleging loss causation under *Dura* and the PSLRA. *See also Bell Atlantic Corp. v. Twombly*, – U.S. –, 127 S. Ct. 1955, 1964-65 (2007) ("a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do . . . .").

To allege loss causation adequately, Plaintiffs must explicitly allege a corrective disclosure – i.e., a statement that corrects a previous misrepresentation or discloses a prior omission – that, when disclosed, negatively affected the value of the security. In *Dura*, the Supreme Court acknowledged that the PSLRA "pleading rules are not meant to impose a great burden upon a plaintiff." *Dura*, 544 U.S. at 347. But, to allow "a plaintiff to forgo giving any indication of the economic loss and proximate cause that the plaintiff has in mind would bring about harm of the very sort the statutes seek to avoid:" permitting a plaintiff "with a largely groundless claim to simply take up the time of a number of other people, with the right to do so representing an *in terrorem* increment of the settlement value, rather than a reasonably relevant evidence." *Id.* (internal quotations and citations omitted). To this end, some courts have interpreted *Dura* as requiring the plaintiff to plead not only that loss occurred following a particular announcement, but also "that the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered,' *i.e.*, that the misstatement or omission concealed something from the market that, *when disclosed*, negatively affected the value of the security." *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 173 (2d Cir.

2005) (internal citation omitted) (first emphasis in original, second emphasis added); *see also In re Alamosa Holdings, Inc.*, 382 F. Supp. 2d 832, 861 (N.D. Tex. 2005) ("Loss causation refers to a direct link between the misstatement and a plaintiff's loss, and generally requires a corrective disclosure relating to the challenged representations, followed by a decline in the stock's price.") (internal citations omitted)

Plaintiffs mistakenly contend that this standard is tantamount to requiring an express mea culpa that will eviscerate the efficacy of the securities laws by rewarding defendants for successfully hiding their wrongdoing. Response at 44 (citing *Ryan v. Flowserve Corp.*, 444 F. Supp. 2d 718, 729 (N.D. Tex. 2006)). As this Court has previously explained, "neither *Dura* nor any Fifth Circuit case requires . . . 'fact-for-fact' method of loss causation pleading," whereby plaintiffs allege that "each fact misrepresented be in turn specifically confessed before liability could attach."[10] *Ryan v. Flowserve Corp.*, 444 F. Supp. 2d 718, 729 (N.D. Tex. 2006). Such a standard would "discourage candor and inhibit the flow of precise, accurate information between corporations and shareholders." *Id.* Yet, neither does *Dura* nor any Fifth Circuit case endorse the unduly broad standard advocated by Plaintiffs here, i.e., that a disclosure of lower than expected earnings constitutes an admission that the company's prior positive statements about its financial health and business were false. If a decline in stock price caused by a company's failure to meet forecasts were legally sufficient to constitute a corrective disclosure, "then any investor who loses money in the stock market

---

[10]This analysis is consistent with *In re Odyssey Healthcare, Inc. Sec. Litig.*, 424 F. Supp. 2d 880, 887-88 (N.D. Tex. 2005).

could sue to recover for those losses without alleging that a fraudulent scheme was ever disclosed and that the disclosure cause their loses." *In re Initial Public Offering Sec. Litig.*, 399 F. Supp. 2d 261, 267 (S.D.N.Y. 2005). In addition to discouraging candor and inhibiting the flow of accurate information, this standard would, in effect, "provide investors with broad insurance against market loss," rather than simply "protect them against those economic losses that misrepresentations actually cause." *Dura*, 544 U.S. at 345; *cf. id.* (securities laws are designed "*not* to provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause.") (emphasis added). Such a standard would directly contravene *Dura* and clearly is not the result Congress intended. *See also* H.R. Conf. Rep. No. 104-369, at 31. Therefore, Plaintiffs have failed adequately to allege loss causation. *See In re Initial Public Offering Sec. Litig.*, 399 F. Supp. 2d at 266 ("[A] failure to meet earnings forecasts has a *negative* effect on stock prices, but not a *corrective* effect.") Accordingly, the Court dismisses Plaintiffs Exchange Act claims.

## IV. THE SECTION 20(A) CLAIM NECESSARILY FAILS

Along with the section 10b(a) and Rule 10b-5 claims, Plaintiffs allege that Defendants violated section 20(a) of the Exchange Act. 15 U.S.C. § 78t(a). Section 20(a) discusses control person liability stating "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter . . . shall also be liable jointly and severally with and to the extent as such controlled person. . . ." *Id.* When a primary violation by the "controlled person" has not been adequately pled, the court should dismiss the section 20(a)

claim. *Southland*, 365 F.3d at 383 ("Control person liability is secondary only and cannot exist in the absence of a primary violation.").  Because Plaintiffs failed adequately to plead an underlying violation of the Exchange Act, the Court must dismiss Plaintiffs' section 20(a) claim.


Signed August 22, 2007.


David C. Godbey
United States District Judge